# Grant Thornton 🦭

## ANALYSIS OF ECONOMIC INJURSIES SUSTAINED AS A RESULT OF THE WRONGFUL TERMONATION OF LISA S. BLACK BY THE CNMI PUBLIC SCHOOL SYSTEM

Sablan Enterprises Bldg., Unit 2E
Chalan Kanoa, Above Bank of Saipan
PMB 443 PPP, Box 10000
Saipan, MP 96950-8900

## ANALYSIS OF ECONOMIC INJURIES SUSTAINED AS A RESULT OF THE WRONGFUL TERMINATION OF LISA S. BLACK BY THE CNMI PUBLIC SCHOOL SYSTEM

### Background

Lisa Black has been a member of the teaching profession since 1984. She has a bachelor's degree from West Virginia Wesleyan University and a master's degree from Michigan State University. Both of Ms. Black's degrees are in education. Ms. Black has told us that she was originally hired by the CNMI Public School system in the mid 1990s and she came to enjoy her life in the CNMI and teaching in the local community.

We understand that on April 25, 2005, Ms. Black was notified that her contract with the Public School System would not be renewed. Indeed, on July 30, 2005 her pay stopped and she found herself unemployed. We have been told that the reason for the non-renewal of her contract was her perceived involvement with a group critical of an administrator at her Junior High School. Ms. Black is adamant that she had no involvement in the production of the letter and actually knew nothing about it until her dismissal. None-the-less, the Public School System terminated her and she found herself without a job.

In order to mitigate her damages Ms. Black accepted part-time and intermittent work that was available from time to time in the CNMI. Finally, however, Ms. Black was forced to accept a position teaching in Morocco in a lifestyle environment that is demeaning to women and at a compensation level that is far below the compensation that she was earning while employed by the CNMI Public School System.

Ms. Black has brought a legal action against the acting principal for the school from which she was wrongfully terminated and also the CNMI Public School system.

### Scope of Our Engagement

We have been asked to determine the economic damages that Ms. Black incurred as a result of her wrongful termination from her teaching position. We have been specifically tasked with determining:

1. Back wages – These are the wages lost by Ms. Black from the time her employment was terminated on July 30, 2005 through the date of her trial, which is assumed to be February 20, 2007, less her mitigating earnings.
2. Front pay – These are the wages Ms Black will lose from the conclusion of the trial through Ms. Black's anticipated retirement date and during her retirement years. The calculation of the "front pay" factor of Ms. Black's economic damages will include the differential in her retirement benefits.

Once we have evaluated the economic damages suffered by Ms. Black as a result of the action of the Plaintiffs for Back wages and Front pay we have been asked to express our opinion as to what we believe Ms. Black's actual damages are in this case.

1

**Documents Reviewed**

During the course of our review of this matter we read and considered the following documents:

- Notification of Personnel Action, Certified Appointment for the Commonwealth of the Northern Mariana Islands, Public School System, P.O. Box 1370 CK, Saipan, MP 96950 for Lisa M. Black and dated June 23, 2004.
- Contract of Employment for Foreign Hire Teachers for the Casablanca American School, Route de la Mecque, Lotissment Ougoug, Quartier Californie, Casablanca, Morocco 20150.
- The Commonwealth of the Northern Mariana Island School System, "Regulations for the Employment of Certified Personnel", dated 1997.
- COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, WRONGFUL TERMINATION, AND DEMAND FOR JURY TRIAL files on November 18, 2005 in the SUPERIOR COURT FOR THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS delineating LISA BLACK the Plaintiff and JIM BREWER, individually and in his capacity as Acting Principal for Hopwood Junior High School, COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS PUBLIC SCHOOL SYSTEM, and JOHN AND/OR JANE DOE, Defendants.
- Pages 5 and 6 of Plaintiff's Response to Defendant's Interrogatories.
- The CIA World Factbook for the United States as of August 8, 2006.

**Analysis**

At the time of her termination from her teaching position with the CNMI Public School System, Ms. Black was earning an annual salary of $37,207.51. We determined this amount by studying the Notification of Personnel Action ("Exhibit 1" to this report). In addition, we have been informed by Ms. Black that she was also paid an additional $400 per month housing allowance. Accordingly, Ms. Black received annual compensation from the CNMI Public School System in the amount of $42,007.51.

In addition to her salary and housing allowance, Ms. Black was also "required by law to be a contributing member of the CNMI's Retirement Fund."[1]

We assumed that Ms. Black would continue to receive the same salary and housing allowance as she was earning at the time of her wrongful termination until December 31, 2012. We then assumed that she would receive a five percent salary increase then and every five years thereafter until she reaches the age of sixty-two.

We prepared an analysis of what Ms. Black's earnings would have been for Back Wages, which is for the time period starting on July 31, 2005 through February 28, 2007. Ms. Black's projected Back Wages, mitigating earnings and net lost earnings are presented in the following table:

---

[1] See §7201 of the Regulations for the Public School System Employment of Certified Personnel, 1997 ("Exhibit 2" to this report.)

**Lisa Black**
**Back Wages Economic Damages Resulting from the CNMI PSS Wrongful Termination of Ms. Black's Contract**

| Year | Age | Projected Earnings At PSS | Interim Earnings and Earnings At Casablanca American School | Difference | Present Value Factor @ 6% | Present Value of Difference |
|------|-----|----------|----------|----------|----------|----------|
| 2005 | 42 | $17,503.13 | $6,995.00 | $10,508.13 | 1.0000000 | $10,508.13 |
| 2006 | 43 | $42,007.51 | $14,156.93 | $27,850.58 | 1.0000000 | $27,850.58 |
| 2007* | 44 | $7,001.25 | $3,393.30 | $3,607.95 | 1.0000000 | $3,607.95 |
| | | $66,511.89 | $24,545.23 | | | $41,966.66 |

\* = Through February 28, 2007.

Had she continued in her employment position with the CNMI Public School System she would have received total salary and housing payments in the amount of $66,511.89 during that time period. This was calculated by multiplying $3,500.63, which was Ms. Black's monthly salary and housing allowance, by nineteen months which equals $66,511.89. However, Ms. Black did attempt to mitigate her losses by securing alternative employment during the Back Wages time period. Accordingly, all of her actual mitigating earnings must be deducted from the $66,511.89 amount lost during the Back Wages time period due to her wrongful termination. During the Back Wages time period Ms. Black had the following actual earnings in Saipan[2]:

| | | |
|---|---|---|
| 1. | From the Northern Marianas Academy | $ 1,657.50 |
| 2. | From the American Education Institute | $ 1,037.50 |
| 3. | For house painting services | $ 400.00 |
| 4. | For sales of USANA Health Sciences Products | $ 3,900.00 |
| | Total | $ 6,995.00 |

In addition, Ms. Black will have earned $17,550.23 during the Back Wages time period in Morocco for total earnings during the time period from her wrongful termination through the trial of $6,995.00 + $17,550.23 for a total of $24,545.23. Deducting this amount from the $66,511.89 that Ms. Black would have earned during the same time period if she had not been wrongfully terminated yields total back wages lost to Ms. Black in the amount of $41,966.67.

In determining Ms. Black's future earnings, or front pay, we referred to the Contract of Employment for Foreign Hire Teachers for the Casablanca American School where Ms.

---

[2] Sourced from pages five and six of Plaintiff's Response to Interrogatories ("Exhibit 3" to this report).

Black now teaches. A copy of this contract is presented as "Exhibit 4" to this report. According to Ms. Black's contract with the Casablanca American School she is receiving a salary of $9,260.00 U.S. Dollars plus 171,968 Moroccan Dirhams per year. Ms. Black utilizes approximately 96,000 Moroccan Dirhams, which is approximately equal to $9,599.80 U.S. Dollars, for her annual local living expenses. Of the remaining 75,968 Moroccan Dirhams Ms. Black can only exchange 15,000 Dirhams into U.S. currency per year. The remainder is lost. Accordingly, Ms. Black's annual earnings at the Casablanca American School are equal to $9,260.00 plus $9,599.80 plus $1,500.00 for a total of $20,360.00 per year. We have assumed that Ms. Black will remain at this same salary level for a period of five years and will then receive a five percent increase every five years until she reaches the retirement age of sixty-two.

In order to determine the amount of retirement benefits that Ms. Black would have received if she was not wrongfully terminated we visited the CNMI Retirement Fund office and interviewed one of the staff there. We learned that Ms. Black's employment was covered by the Government's defined benefit plan. We also learned that Ms. Black would be entitled to retire at the age of sixty two and receive benefits from the Retirement Fund in the amount of $21,536.17 per year for the rest of her life.

At the Casablanca American School there is no defined benefit plan. Instead there is a plan that is similar to the 401k plans in the United States. The Casablanca American School contributes five percent of Ms. Black's annual salary to the plan. We have calculated the amount of these contributions that would accumulate to Ms. Black's benefit until she reaches the age of sixty-two. Included in this calculation we assumed that the amount in Ms. Black's account would grow at the rate of six percent per year. We then allocated the balance that would be in Ms. Black's account when she reached the age of sixty-two and allocated that balance plus the continued earnings in her account in equal annual withdrawal amounts over the remainder of her expected life. This amount is $4,900 per year.

In order to make an informed estimate of Ms. Black's life expectancy we referred to the CIA World Factbook for the United States as of August 8, 2006. In the Factbook we learned that Ms. Black's current life expectancy is 80.82 years. Accordingly, we utilized a life expectancy figure of eighty-one years of age.

The table appearing on the following page of this report provides a direct comparison of the earnings that Ms. Black would have earned if she had not been wrongfully terminated by the CNMI Public School System with her projected earnings at the Casablanca American School.

Lisa Black
**Front Wages Economic Damages Resulting from the CNMI PSS Wrongful Termination of Ms. Black**

| Year | Age | Projected Earnings At PSS | Earnings At Casablanca American School | Difference | Present Value Factor @ 6% | Present Value of Difference |
|------|-----|---------------------------|----------------------------------------|------------|---------------------------|------------------------------|
| 2007* | 44 | $35,006.26 | $16,966.50 | $18,039.76 | 1.0000000 | $18,039.76 |
| 2008 | 45 | $42,007.51 | $20,359.80 | $21,647.71 | 0.9434000 | $20,422.45 |
| 2009 | 46 | $42,007.51 | $20,359.80 | $21,647.71 | 0.8900000 | $19,266.46 |
| 2010 | 47 | $42,007.51 | $20,359.80 | $21,647.71 | 0.8396200 | $18,175.85 |
| 2011 | 48 | $42,007.51 | $21,302.79 | $20,704.72 | 0.7920900 | $16,400.00 |
| 2012 | 49 | $42,007.51 | $21,302.79 | $20,704.72 | 0.7472600 | $15,471.81 |
| 2013 | 50 | $43,867.89 | $21,302.79 | $22,565.10 | 0.7049600 | $15,907.49 |
| 2014 | 51 | $43,867.89 | $21,302.79 | $22,565.10 | 0.6650600 | $15,007.14 |
| 2015 | 52 | $43,867.89 | $21,302.79 | $22,565.10 | 0.6274100 | $14,157.57 |
| 2016 | 53 | $43,867.89 | $22,292.77 | $21,575.11 | 0.5919000 | $12,770.31 |
| 2017 | 54 | $43,867.89 | $22,292.77 | $21,575.11 | 0.5583900 | $12,047.33 |
| 2018 | 55 | $45,821.28 | $22,292.77 | $23,528.51 | 0.5267900 | $12,394.59 |
| 2019 | 56 | $45,821.28 | $22,292.77 | $23,528.51 | 0.4969700 | $11,692.96 |
| 2020 | 57 | $45,821.28 | $22,292.77 | $23,528.51 | 0.4688400 | $11,031.11 |
| 2021 | 58 | $45,821.28 | $23,331.60 | $22,489.68 | 0.4423000 | $9,947.19 |
| 2022 | 59 | $45,821.28 | $23,331.60 | $22,489.68 | 0.4172700 | $9,384.27 |
| 2023 | 60 | $47,872.34 | $23,331.60 | $24,540.74 | 0.3936500 | $9,660.46 |
| 2024 | 61 | $47,872.34 | $23,331.60 | $24,540.74 | 0.3713600 | $9,113.45 |
| 2025 | 62 | $47,872.34 | $23,331.60 | $24,540.74 | 0.3503400 | $8,597.60 |
| 2026 | 63 | $21,536.17 | $4,900.00 | $16,636.17 | 0.3305100 | $5,498.42 |
| 2027 | 64 | $21,536.17 | $4,900.00 | $16,636.17 | 0.3118000 | $5,187.16 |
| 2028 | 65 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2941600 | $4,893.70 |
| 2029 | 66 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2775100 | $4,616.70 |
| 2030 | 67 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2618000 | $4,355.35 |
| 2031 | 68 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2469800 | $4,108.80 |
| 2032 | 69 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2330000 | $3,876.23 |
| 2033 | 70 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2190200 | $3,643.65 |
| 2034 | 71 | $21,536.17 | $4,900.00 | $16,636.17 | 0.2058788 | $3,425.03 |
| 2035 | 72 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1935261 | $3,219.53 |
| 2036 | 73 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1819145 | $3,026.36 |
| 2037 | 74 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1709996 | $2,844.78 |
| 2038 | 75 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1607397 | $2,674.09 |
| 2039 | 76 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1510953 | $2,513.65 |
| 2040 | 77 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1420296 | $2,362.83 |
| 2041 | 78 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1335078 | $2,221.06 |
| 2042 | 79 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1254973 | $2,087.79 |
| 2043 | 80 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1179675 | $1,962.53 |
| 2044 | 81 | $21,536.17 | $4,900.00 | $16,636.17 | 0.1108894 | $1,844.78 |

$323,850.24

\* = From March 1, 2007 through December 31, 2007.

**Pre-Judgment Interest**

We have not calculated pre-judgment interest on the back wages. However, we believe that the 9% CNMI Statutory annual interest rate is the proper rate to be used in making that calculation.

**Qualifications and Compensation**

Included, as "Exhibit 5" to this report, is a copy of the resume of Roger D. Slater, CPA, who personally researched and wrote this report. Included as "Exhibit 6" to this report is a listing of cases in which Mr. Slater has performed as an expert witness. I am being compensated on an hourly basis for all of the work performed on this case at the rate of $150 per hour. I have made no contingency arrangement with anyone, including the Plaintiff and her attorneys, and have no vested interest in the outcome of this case.

**Preliminary Report**

This report is a preliminary report based on the documents and information made available to us as of our report date. A supplementary report may be necessary if new information comes to our attention.

**Conclusion**

Based on the information available to us as of this report date and our analysis of that information it is our conclusion that with reasonable certainty Ms. Black's economic damages incurred as a result of her July 30, 2005 wrongful termination are detailed as follows:

|   |   |   |
|---|---|---|
| 1. | Back Wages | $ 41,966.67 |
| 2. | Front Pay | 323,850.24 |
|   | Total | $ 365,816.91 |

We have not included in our calculations any out of pocket costs that Ms. Black may have incurred in searching for new employment. Any such costs should be added to our findings.

Accordingly, it is our considered opinion that the total economic damages suffered by Ms. Lisa Black as a result of her July 30, 2005 wrongful termination by the defendants in this legal action is, with reasonable certainty, best stated as:

**THREE HUNDRED SIXTY FIVE THOUSAND DOLLARS**

**$365,000**

*Grant Thornton, LLP*

GRANT THORNTON, LLP

by: ROGER D. SLATER, CPA
     Managing Partner

Chalan Kanoa, Saipan

October 27, 2006

**Exhibit 1**

**Notification of Personnel Action Form**

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
PUBLIC SCHOOL SYSTEM
P.O. BOX 1370 CK, SAIPAN, MP 96950

## NOTIFICATION OF PERSONNEL ACTION

CERTIFIED APPOINTMENT

**PSPS-1000-B. 2**

| a. ( ) Mr. ( ) Mrs. ( ) Miss<br>**BLACK**        LISA        S<br>NAME: (CAPS) Last–First–Middle | b. CITIZENSHIP<br>US | c. BIRTH DATE<br>08/29/61<br>Month/Day/Year | d. SERV. COMP. DATE<br><br>Month/Day/Year |
|---|---|---|---|
| e. SOCIAL SECURITY NO.<br>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      2050 | f. GROUP LIFE INSURANCE<br>WAIVED | | g. HEALTH INSURANCE:<br>Code No.      WAIVED |

| h. NATURE OF ACTION:<br>AMENDMENT-CERTIFIED  EMPLOYMENT  CONTRACT  NO.E4716<br>(NTE: ~~06/04/2004~~  )  07/30/2005 ) | | | i. EFFECTIVE DATE<br>6/5/04<br>Month/Day/Year |
|---|---|---|---|
| j. FROM:<br>CLASSROOM  TEACHER  IV | k. PAY LEVEL/STEP<br>VIII/06 | l. SALARY    : ~~$17.868/HOUR~~<br>BI-WEEKLY:    $1,431.06<br>PER ANNUM:    $37,207.51 | |
| POSITION TITLE AND NUMBER<br>2330 | | | |

| m. NAME AND LOCATION OF EMPLOYING OFFICE:<br>HOPWOOD  JR.  HIGH  SCHOOL | | n. DUTY STATION<br>SAIPAN |
|---|---|---|

| o. TO:<br>CLASSROOM  TEACHER  IV | p. PAY LEVEL/STEP<br>VIII/06 | q. SALARY    : ~~$17.868/HOUR~~<br>BI-WEEKLY:    $1,431.06<br>PER ANNUM:    $37,207.51 |
|---|---|---|
| POSITION TITLE AND NUMBER<br>2330 | | |

| r. NAME AND LOCATION OF EMPLOYING OFFICE:<br>HOPWOOD  JR.  HIGH  SCHOOL | s. DUTY STATION<br>SAIPAN |
|---|---|

LEAVE ACCRUAL ELIGIBILITY

ANNUAL ☐                                                   SICK ☐

| NO. OF HOURS PER PAY PERIOD      03  HRS. | NO. OF HOURS PER PAY PERIOD      01.5  HRS. |
|---|---|

| u. ACCOUNT CHARGEABLE:<br>41050-4110-900/HJH | v. SUBJECT TO:   CNMI Income Tax  (X)      CNMI Retirement  (X)<br>Social Security  ( )      Other      ( ) |
|---|---|

w. REMARKS:

THIS AMEND ITEM H (EXPIRATION DATE OF CERTIFIED EMPLOYMENT CONTRACT NOE.4716 OF NOTIFICATION OF PERSONNEL ACTION DATED 03/03/2004 TO READ AS 07/30/2005 INSTEAD OF  06/04/2004.

ANNUAL/SICK  LEAVE  BALANCE  WILL  BE  CARRIED  ON  TO  THIS  AMENDMENT.

REF:  PER  ATTACHED  RECOMMENDATION  MEMO  DATED  06/01/2004.

| (Signature) | CHARLEY KANIS<br>Human Resources Officer | 6/30/04<br>Date |
|---|---|---|
| (Signature) | RICHARD WALDO<br>Finance and Budget Officer | 6/23/04<br>Date |
| (Signature) | RITA A. HOCOG INOS., Ed.D.<br>Commissioner of Education | 06.23.04<br>Date |

DISTRIBUTION:
1. Employee–White   2. Personnel–OPR–Green   3. Payroll–Pink   4. Program Manager–Goldenrod   5. Fiscal–Blue

**Exhibit 2**

**Regulations for the Public School System
Employment of Certified Personnel
Section 7201 of the Regulations**

Aug 15 06 12:00p    Grant Thornton                    6702341495                    P.1

ATTN: ROGUE.
PH: FAX:
( 7 page )





**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
**PUBLIC SCHOOL SYSTEM**

1997

**Regulations for the Public School System Employment of Certified Personnel**

Aug 15 06 12:01p     Grant Thornton     6702341485     p.2

c. Sexual harassment can include, but is not limited to, jokes, comments, touching, and pressure for dates or sexual activity.

**B.     Violations and Employee Discipline**

**§6201.     Reporting Violations.** Any employee who believes that he or she is a victim of discrimination or harassment in connection with employment at the PSS should report the matter immediately as a grievance under Chapter 5 of these regulations. A grievance under this section shall be investigated promptly and with an effort to protect the privacy of those involved.

**§6202.     Employee Discipline.** An employee who is determined to have violated the provisions of this chapter shall be subject to appropriate disciplinary action, up to and including termination of employment. Although not necessarily rising to the level of discrimination or harassment, other inappropriate or offensive actions will not be tolerated and may form the basis for appropriate discipline.

44

**CHAPTER 7:     EMPLOYMENT BENEFITS**

**A.     Insurance**

**§7101.     Medical and Life Insurance**

Medical and Life Insurance are made available to PSS employees by the Commonwealth Government. Such insurance is made available in the form of group policies in which the Employer, at his or her discretion, may wish to participate. Participation is on a basis where the PSS pays a portion of the insurance premium and the employee pays the remainder. If the Employer chooses to participate, then PSS will contribute to premiums on the same basis as the Commonwealth Government contributes for its employees.

**B.     Retirement**

**§7201. Retirement Fund**

PSS employees are required by law to be contributing members of the CNMI's Retirement Fund. Thus, it is mandatory that the PSS withhold a certain portion from each employee's paycheck and deposit it with the Retirement Fund. The PSS is also required to contribute additional funds on the employee's behalf. The Retirement Fund is responsible for administration of all aspects of PSS employee participation in the Fund and any questions regarding PSS employee participation or benefits should be brought directly to the Fund. The PSS bears no responsibility for any money deposited in the Fund.

**C.     Leave**

**§7301. Purpose of Leave.**

The purpose of providing leave to PSS employees is to allow them personal time to take care of non-PSS related business, to relax, and to recuperate from illness or injury. The importance of an employee being allowed time to take care of personal business, to relax, and to recuperate from illness or injury is recognized by the PSS. Employee's whose personal lives are in balance are better able to handle the requirements of their job at the PSS.

**§7302. Annual Leave.**

45

Exhibit 3

Plaintiff's Response to Interrogatories

Pages 5 and 6

1   **Response to Interrogatory No. 2:**   Because of the wrongful termination of Plaintiff, she has

2   suffered pecuniary damage in the form of lost wages and employee benefits.   As a direct and

3   proximate consequence of this loss of wages and benefits, Plaintiff has been unable to seek

4   medical attention and medication for various conditions from which she suffers including ear

5   infections and routine physical examination such as her yearly mammograms.   Additionally,

6   she has suffered from the stress and emotional strain associated with being terminated from her

7   teaching position and the attendant damage to her personal and professional reputation in the

8   community.   Also, because of this added stress and strain on Plaintiff's health, a skin condition

9   from which she suffers has been exacerbated.   Furthermore, as discovery in this matter is

10  ongoing and both party and fact witness depositions have yet to be conducted, Plaintiff reserves

11  the right to update this interrogatory, up to and including at trial, as new facts become known to

12

13  her.

14

15

16  **Interrogatory No. 3:**        Please identify all employers and state all money that you have

17  received for work, through employment or self-employment, from July 30, 2005 through the

18  present.

19

20  **Response to Interrogatory No. 3:**   Without waiving objections, Plaintiff states that she has

21  had the following employers since July 30, 2006:

22          Northern Marianas Academy
            P.O. Box 10006 PMB 834
23          Saipan, MP 96950
            (670) 235-5597
24

25          American Education Institute
            P.O. Box 5310 CHRB
26          Saipan, MP 96950
            (670) 234-0505
27

28                                        5

☒005

1

2

3
USANA Health Sciences
3838 West Parkway Boulevard
Salt Lake City, UT 84120
(801) 954-7200

4

5

6

7
Casablanca American School
Route de la Mecque,
Lotissement Ougoug,
Quartier Californie,
20150 Casablanca
MOROCCO Tél.: +(212) (0)22.21.41.15

8

9
Plaintiff received the following pay for the time period covered by this interrogatory:

10
From Northern Marianas Academy: $1657.50

11
From American Education Institute: $1037.50

12
For housepainting services: $400.00

13
For sales of USANA Health Sciences products: $3900.00

14
From Casablanca American School (approximate due to fluctuating exchange rates):

15
$3977.03

16

17
**Interrogatory No. 4:**        For any alleged injury or emotional distress sustained by Plaintiff

18
as a result of any action or inaction of PSS or its employees, identify all health care providers,

19
who provided or are currently providing treatment to Plaintiff, and include the reason for the

20
nature of the treatment provided, and the amount of the charges for the treatment.

21
**Response to Interrogatory No. 4:**  Plaintiff objects as this interrogatory does not seek

22
information that is either admissible at trial or reasonably calculated to lead to the discovery of

23
information that is admissible at trial and is vague and/or overly burdensome. Without waiving

24
the aforementioned objections, all treatment for any injuries and/or emotional distress that

25
Plaintiff has suffered because of the actions and/or inactions of Defendants has been performed

26

27

28

6

**Exhibit 4**

**Contract of Employment For Foreign Hire Teacher**
**Casablanca American School**
**Pages 1 through 3**

06/04/2006 15:53 FAX                                    @006

**Casablanca American School**
**Route de la Mecque, Lotissment Ougoug**
**Quartier Californie**
**Casablanca, Morocco  20150**

**Tel: (212) (22) 21.41.15**
**Fax: (212) (22) 21.24.88**
**Email: cas@cas.ac.ma**

**website: www.cas.ac.ma <http://www.cas.ac.ma/>**

### CONTRACT OF EMPLOYMENT FOR FOREIGN HIRE TEACHERS

This Contract is made this **12th** day of April **2006** between the Casablanca American School (hereinafter called the "Employer" or the "School") and **Lisa S. Black** (hereinafter called the "Employee") of **Saipan, Northern Mariana Islands, USA** whereby it is agreed as follows:

**1.     Duration of Contract**

The Employer agrees to employ the Employee and the Employee agrees to serve the School for a period beginning **April 24th, 2006** through **August 14th, 2008.\*** The date of arrival for new and returning faculty is determined each year by the Director.

*\* For faculty hired prior to the 2001/2002 academic year, salary and benefits due for the period of August 15, 2001 through August 31, 2001 will be due instead for the period of August 15 through August 31 the year of termination of employment with CAS. This is due to the fact that the 2000/2001 and 2001/2002 contracts have a two-week overlap.*

**2.     Remuneration**

a)     The Employer shall pay the Employee an annual salary of **$9260.00** and **MAD 171,968.00** which corresponds to **Column III, Step 5** on the 2006/2007 Teachers' Salary Schedule for full-time teaching staff. At the completion of a successful year of teaching, the salary will be adjusted to the next step on the salary schedule.  In order to safeguard the viability of the salary in the local economy, every two years the school will conduct a cost of living review according to established procedures.

b)     The annual salary shall be paid in pro rata payments as follows: from August to June in arrears by the last working day of each month each year of the Contract in accordance with the School's monthly payment schedule fixed in August each year. June and July salaries shall be paid in June and August's salary shall be paid at the end of August.

c)     The Employer is authorized to deduct from the Employee's salary all amounts owed by the Employee, for payment of utilities and other unpaid bills.

initials: _____                                    4/14/06

@00

d)      Upon termination of employment and successful completion of obligations, the School will pay, upon final clearance, June, July and August salary in U.S. dollars if available. If U.S. dollars are not available, the final dirham portion of the June, July and August salary, minus MAD 2000 withheld as payment for bills and other expenses, will be paid by May 15th. The final dollar portion of the June, July and August salary may be withheld in all or part pending final clearance.

### 3.    Medical Benefits

a)      Medical coverage will begin on August 15th for the Employee and his/her accompanying spouse and dependents.

b)      The Employee shall provide, when required, a medical certificate of fitness to undertake or continue this assignment, on a school provided form, from a qualified physician, and to the satisfaction of the Employer. The cost of this medical examination shall be borne by the Employee. Additional medical examinations as required by the Employer will be at the expense of the School.

c)      The School will make available to the Employee, and his/her accompanying spouse and dependents, international health insurance for medical treatment only with the School's international health insurance carrier. The School will pay 100% of the premiums for such insurance during the term of the Contract.

d)      The Employer's responsibility consists solely of providing the means for the Employee to enroll him/herself and his/her accompanying spouse and dependents in the insurance program, and paying for the necessary premiums.

### 4.    Long Term Disability Insurance

The Employer will provide long-term disability insurance coverage equal to the annual salary of the Employee each year of the Contract under the existing group coverage plan.

### 5.    Life Insurance

The Employer will provide term life insurance coverage equal to the annual salary of the Employee each year of the Contract under the existing group coverage plan.

### 6.    Retirement Program

The School will contribute for the Employee an amount equal to five (5) percent of the Employee's annual salary towards a retirement program in effect each year during the term of the Contract. This contribution may be made directly to the retirement program or, upon mutual agreement, to the Employee.

Initials: _RB_    4/14/06

006 15:54 FAX                                                              Ⴗc

### 7.    Housing

a)    The Employer will provide the Employee and accompanying spouse and dependents adequately furnished housing. In the case of a faculty member without an accompanying spouse or dependents, the School may require that the housing be shared with another contracted teacher.

b)    CAS housing cannot be subleased.

c)    Occupants of CAS housing are fully responsible for any loss or damage caused to the unit or its contents, by the acts or omissions of the Employee and accompanying spouse or dependents or guests, and are required to keep the unit and any adjoining external areas in a clean and neat condition.

d)    A separate inventory, which the Employee will verify and sign, shall be presented to each Employee upon occupying a CAS unit and the Employee(s) shall be responsible for replacing broken and damaged items and for the costs of all repairs (labor and materials) to the unit during the period of occupancy. Normal wear and tear will be taken into consideration.

e)    Food, utilities, heat, telephone, and maid service are not covered by the school and shall be the full responsibility of the Employee.

f)    Insurance of personal effects shall be the responsibility of the Employee.

g)    CAS housing must be vacated fourteen (14) days after the last day of classes of the final year of this Contract unless the Employee has entered into a new employment Contract with the School for the following academic year, or received prior authorization by the Director.

### 8.    Transportation

a)    The Employer will pay for the most economical air transportation for the Employee to Casablanca from the commercial airport nearest to the Employee's Home of Record prior to the beginning of the Contract period. For newly hired Employees, the Employer will arrange for all purchases of plane tickets and routing arrangements through its travel agents.

b)    The Employer will pay for the Employee's return air ticket, or provide the cash equivalent in Moroccan dirhams, to the commercial airport nearest to the Employee's Home of Record at the end of the Contract period at the most economical rate available.

c)    The Employer will also pay for air tickets, or provide the cash equivalent in Moroccan dirhams, in accordance with Clause 8a and 8b above only for the Employee's spouse, pre-school age children and those children enrolled in the Casablanca American School as full-time students if they have not yet reached their twenty-second birthday.

initials: _____

4/14/06

**Exhibit 5**

**Resume of Qualifications
of
Roger D. Slater, CPA**

## RESUME OF QUALIFICATIONS

**ROGER D. SLATER, MBA, CPA**

---

**GRANT THORNTON, LLP**
Guam and Micronesia
Dhonson Plaza, Suite B
790 Marine Corps. Drive
Tamuning, Guam 96913
(671) 649-3800
(671) 687-6711

## PROFESSIONAL EXPERIENCE

**2000 to Present**     **Grant Thornton, LLP**
                        **Slater, Nakamura & Co, LLP**
                        **Certified Public Accountants**

                        Managing Partner in this general services CPA firm. Specializing in auditing, distressed entity consultation, forensic accounting, business valuations, trustee and receivership services, litigation support services and income taxes.

**1991 to 2000**        **Roger D. Slater, CPA**
                        **Management Consulting Services**

                        Provided general and financial management services to clients on a consulting basis. Client base was primarily compiled of companies with special needs such as bankruptcies, financial and managerial difficulties and start-up ventures.

**1996 to 1998**        **Pacific International Co., Inc. - Tamuning, Guam**
                        **Chief Financial Officer**

                        Assumed leadership of this company's financial operations at a time when it was about to undergo a major transformation. Working closely with parent company personnel and the CEO, was able to greatly simplify an overly complicated accounting and reporting system resulting in reduced staff and faster reporting. Oversaw the financial aspects of the closure of one major business and the sale of two others. In conjunction with those sales, led and participated in sensitive negotiations leading to those divestitures.

                        As the Company executive in charge of Human Resources, was able to reduce the department's cost by 80% while improving services to employees.

                        Worked closely with operational management to provide strong financial and accounting support for new businesses being built by the company.

**1993 to 1996**        **Atkins Kroll, Inc. - Tamuning, Guam**
                        **Chief Financial Officer and Vice President for General Motors and Mercedes-Benz Division**

                        Atkins Kroll is a subsidiary of Inchcape plc, which is headquartered in London and is a $9 billion international trading company.

                        Was recruited as Finance Director to resolve the company's accounting, reporting, internal control and financial problems.

Resolved these problems within six months by simplifying and standardizing the accounting and computer systems throughout the company's divisions. By closely monitoring cash flows and financing demands, overall borrowing requirements were reduced by 90% over two years. These actions allowed for financial accounting staff reductions of 75%.

As VP and General Manager of the General Motors and Mercedes-Benz Division, was tasked with establishing a stand-alone business (from a previous conglomeration with Toyota). Accomplished this goal by spearheading the development of new facilities, developing a strategic plan for the division, improving market share and margins, developing strong relationships with principals, building a cohesive team, developing aggressive marketing, advertising and promotional campaigns and returning the division to profitability.

**1992 to 1993**        **Calvo Specialty Retailing - Harmon, Guam**
**Chief Operating Officer - $6 million company**

Assumed control of company when it was suffering from management and profitability problems. Led the company while establishing a sound strategic plan, simplifying the accounting system, installing a computerized point-of-sale inventory control system, strong leadership, and hands-on management to create a high level of morale and productivity throughout the company.

**1984 to 1991**        **Metropolitan Insulation Supply Co., Inc. - Denver, CO**
**President - $6 million company**

Took over control of business when it was the smallest competitor in its market. Increased sales from $1.8M to $6M, in a market which declined 85%. Gained sales and profitability increases through market and strategic analysis, which resulted in a comprehensive company growth plan. This plan included four acquisitions, geographical expansion, and the adoption of a market oriented approach which was better able to identify customer needs and opportunities for the company.

**1981 to 1984**        **Island Equipment Company - Guam**
**Corporate Controller - $20 million company**

Island Equipment Company is a subsidiary of Schnitzer Steel Products which is a substantial conglomerate headquartered in Portland, Oregon.

23

Relocated accounting department from stateside location to Guam. Managed all accounting and finance functions and participated in the general management of the company's 18 businesses which included retail, wholesale, manufacturing, scrap recycling and real estate ventures.

**1978 to 1981**  **Atkins Kroll & Co., Ltd. - Guam, Saipan, the Philippines and San Francisco**
**Corporate Comptroller - $50 million company**

Atkins Kroll is a subsidiary of Inchcape & Company, Ltd., which is headquartered in London and is a $9 billion international trading company.

Created and implemented standardized accounting systems, policies and procedures. Relocated to and/or worked in several locations within the corporation such as San Francisco, Guam, Saipan and the Philippines. Major

emphasis was on financial management, installing a comprehensive budgeting system, consolidating accounts and general management troubleshooting.

**1974 to 1978**  **Peat Marwick Mitchell & Co. Guam**
**Supervising Senior Auditor**

Experienced in managing the audits of hospitality, automotive, government agencies, public utility, international trading, retail, wholesale and service industries. Promoted quickly from Staff Auditor to Supervising Senior in three years.

**1973 to 1974**  **Palmer, Wiggs and Heston, CPA's - Guam and Micronesia**
**Staff Auditor**

General Audit experience on a variety of engagements.

**EDUCATION**  University of Colorado
Graduate School of Business Administration
M.B.A. Executive Program, 1990
Class Rank: 1 of 44; GPA: 4.0
Currently ranked in the top 1.2% of all graduates

University of Denver
B.S. in Business Administration, 1973
Major: Accounting

Arapahoe Community College
A.A. in Business, 1971

## PROFESSIONAL AND COMMUNITY CERTIFICATES & ORGANIZATIONS

- Certified Public Accountant - Guam, 1975
- Certified Public Accountant - Colorado, 1986
- Guam Board of Accountancy, served two terms
- National Association of State Boards of Accountancy, past member
- Guam Society Certified of Public Accountants
- American Institute of Certified Public Accountants
- Former Chairman - Fundraising Committee for Boy Scouts
- Micronesia Conservation Society – Co-founder, Secretary/Treasurer
- Guam Power Authority Board of Directors, past member

## OTHER QUALIFICATIONS AND EXPERIENCE

- U.S. Bankruptcy Trustee
- Receiver for the HIH and the FAI Insurance companies

## MILITARY

- United States Army - 1968 to 1970
- Military Intelligence Command
- Vietnam Veteran - Honorable Discharge

**Exhibit 6**

## LISTING OF CASES IN WHICH ROGER D. SLATER HAS BEEN ENGAGED AS AN EXPERT WITNESS

**ROGER D. SLATER, CPA, MBA**
**Experience as an Expert Witness**

Cases in which Roger D. Slater has been qualified as an expert witness and provided expert testimony in trial:

| | **Case** | **Court Qualified Expert Services** | **Type of Dispute** |
|---|---|---|---|
| 1. | Time Marketing *v.* Pacific International Company | Economic damage expert | Lease dispute |
| 2. | IIU *v.* Takagi & Assoc. | Accounting and economic damage expert | Unfair trade practices |
| 3. | Atalig et al *v.* The Rota Municipal Council | Economic damage and compensation expert | Wrongful termination |
| 4. | Marine Resources Corp. *v.* The Department of Land and Natural Resources | Accounting and economic damage expert | Contractual dispute |
| 5. | Richardson *v.* Richardson | Accounting and compensation expert | Divorce |
| 6. | Saipan Achugao Resort Homeowners Association v. Yoon | Accounting and economic damage expert | Resort ownership dispute |
| 7. | David Alcorn v. Freddy Van Dox | Accounting, economic damage and compensation expert | LLC dispute |
| 8. | King *v.* King | Valuation expert | Divorce |

| | | |
|---|---|---|
| **9.** RCS, Inc. *v.* Shell Oil Guam | Accounting and economic damage expert | Contractual dispute |
| **10.** Chen *v.* Chen | Accounting expert | Divorce |

**Cases in which Roger D. Slater has been retained as an expert and has issued a written report, or been deposed but has not testified at trial:**

| <u>Case</u> | <u>Expert Services</u> | <u>Type of Dispute</u> |
|---|---|---|
| **11.** GE Capital *v.* Reyes Helicopter | Accounting and economic damage expert | Collection dispute |
| **12.** Nissan Motors *v.* Keico Motors and Kim | Accounting and economic damage expert   * | Lease dispute |
| **13.** Royal Palm Homeowners Assn *v.* Ssangyong Construction, et al | Economic damage expert | Construction dispute |
| **14.** RCS, Inc. *v.* Shell Oil Guam | Accounting and economic damage expert | Contractual dispute |
| **15.** NPI (CNMI) Receiver *v.* Pacific Basin Insurance | Accounting expert | Collection dispute |
| **16.** Anthony Ada *v.* Shell Oil Guam | Economic damage expert | Contractual dispute |
| **17.** Robert Steffy, U.S. Bankruptcy Trustee for GMHP *v.* Frank Rosario et al | Accounting and bankrupcy expert | Bankruptcy fraud |
| **18.** U.S. Department of Labor *v.* Mariana Fashion, Inc. | Accounting and compensation expert | Labor dispute |

| | Case | Expert Services | | Type of Dispute |
|---|---|---|---|---|
| **19.** | Song, Jin Ja *v.* NMI Star Corp. | Accounting and economic damage expert | | Fraud case |
| **20.** | Makepeace *v.* U.S. Navy | Accounting and economic damage expert | | Contractual dispute |
| | **Case** | **Expert Services** | | **Type of Dispute** |
| **21.** | Meyer *v.* Citibank | Accounting expert | | Collection dispute |
| **22.** | Sadhwani *v.* Medabalmi | Valuation expert | | Business dissolution |
| **23.** | Villagomez *v.* Grand Hotel | Economic damage expert | | Wrongful death case |
| **24.** | Camacho *v.* MPLA | Economic damage expert | | Land taking case |
| **25.** | Young Ha Lee *v.* Mobil Oil | Accounting and economic damage expert | | Contractual dispute |
| **26.** | CMS v. Western Equipment et al | Economic damage expert | | Contractual dispute |
| **27.** | Martineau *v.* Martineau | Accounting and valuation expert | * | Divorce |
| **28.** | Leo D. Slotnick Estate | Fraud and forensic accounting expert | | Probate |
| **29.** | Pacific Amusements *v.* CNMI Dir. Of Finance | Accounting expert | | Claim against the CNMI Government |
| **30.** | Lee *v.* Manhattan | Economic damage expert | | Personal injury case |

**\* = Have been deposed.**