Heather L. Kennedy
Karen M. Klaver
CNMI Public School System
P. O. Box 501370 CK
Saipan, MP  96950

Telephone:  (670) 237-3046
Fax: (670) 664-3713

Attorneys for:  Public School System

## IN THE UNITED STATES DISTRICT COURT
## OF THE NORTHERN MARIANA ISLANDS

|  |  |
|---|---|
| | ) Civil Case No. 05-0038 |
| | ) |
| LISA S. BLACK | )**MEMORANDUM IN SUPPORT OF** |
| Plaintiff | ) **MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| JIM BREWER, individually and in his official capacity as Acting Principal of HJHS Junior High School , CNMI Public School System and JOHN AND/OR JANE DOE, | |
| Defendants | |

## DEFENDANT CNMI PUBLIC SCHOOL SYSTEM'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.     STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure requires that a motion for summary judgment be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  After the moving party makes a properly supported motion, the responding party must present specific facts

showing that contradiction of the moving party's presentation of evidence is possible. See *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978). The mere existence of some alleged factual disputes between the parties will not defeat an otherwise proper motion for summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986).

## II.    PLAINTIFF'S FIRST CAUSE OF ACTION AGAINST PSS ALLEGING A VIOLATION OF HER FREE SPEECH RIGHTS MUST BE DISMISSED.

### A.    Speech Rights of Public Employees Are Not Absolute.

The fundamental maxim of free speech is that government must tolerate and cannot restrain the exercise of free speech in open debate by the public regardless of whether it is offensive, tumultuous, or discordant. *Cohen v. California*, 403 U.S.15, 91 S. Ct. 1780 (1971). However, "when a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom". *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006). Even though a private person is completely free to uninhibitedly criticize a governor's or a legislature's position on a subject, the Court has never suggested that the governor or legislator (or school superintendent) could not fire a subordinate administrator or government official for similar criticism. See, *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006); *Waters v. Churchill*, 511 U.S. 661, 697, 114 S. Ct 1878, 128 L.Ed.2d 686 (1994); *Branti v. Finkel*, 445 U.S. 507, 100 S. Ct. 1287, 63 L.Ed. 2d 574 (1980). Public officials are not constitutionally required to allow public dissent by their subordinates. *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006) (When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom). The U.S. Supreme Court in *Garcetti* held:

Government employers, like private employers, need a significant degree of control over their employee's words and actions; without it there would

be little chance for the efficient provision of public services. *Garcetti v. Ceballos*, 126 S.Ct. at 1958 .

Supreme Court jurisprudence affords public employers "sufficient discretion to manage their operations." *Garcetti,* 126 S. Ct. at 1960.

## B. The U.S. Supreme Court follows a two-step analysis for evaluating public employee free speech claims.

When a public employee claims to have suffered discrimination because of the employee's exercise of rights guaranteed by the First Amendment, a court reviewing that claim must engage in a two-step analysis.  First, the court inquires, as a matter of law, whether the speech was constitutionally protected: "whether the employee spoke as a citizen on a matter of public speech." *Garcetti,*126 S. Ct. at 1958.  Second, the employee's interest in "commenting upon matters of public concern" must outweigh the public employer's interest "in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

Preliminarily, the Court must determine if the First Amendment protects Plaintiff against termination for the type of speech in which she was engaged. *McKinley v. City of Eloy,* 705 F.2d 1110, 1113 (9th Cir.1983). In *Pickering v. Bd. of Educ.,* the United States Supreme Court articulated the "public concern" test in an attempt to balance the rights of public employees to free speech and of the government to regulate the workplace. Under *Pickering,* termination or other retaliation as a consequence of speech does not run afoul of the First Amendment unless the speech addresses a matter of "public concern." *Id.* at 572-74. Determining whether the speech in question involves a matter of public concern mandates an inquiry into the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147-148, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983).

**C.    What Speech? Perceived Free Speech Is Not Protected Under the First Amendment.**

Before evaluating the two-step analysis for free speech, there must first be speech. Constitutional rights are personal and cannot be delegated or exercised vicariously.  Plaintiff cannot claim a vicarious violation of First Amendment protections based on others' alleged public comments. *See Prestopnik v. Whelan,*  253 F.Supp.2d 369, 374 (N.D.N.Y. 2003) (providing that the First Amendment provides for personal rights and plaintiff cannot be a victim where her speech was not personally chilled by government action); *Steadman v. Texas Rangers*, 179 F.3d 360 (5th Cir. 1999)(dismissing the §1983 perceived free speech claim of a female officer absent evidence that she engaged in some protected First Amendment activity).

In *Steadman,* the court stated "another aspect of the test, which should go without saying but which is central to the case at bar, is that the plaintiff actually *spoke* or otherwise engaged in speech activities recognized by our First Amendment jurisprudence.  Even assuming . . .  a finding that [Plaintiff] engaged in speech activities, it is an understatement to say that her claim does not fall within an easily cognizable free-speech paradigm." *Steadman*, 179 F.3d at 368.  The court stated in regards to the perceived free speech violation, "we cannot simply allow the case to proceed past summary judgment on the theory that [Defendant's] actions on their face were an attempt to violate First Amendment rights." *Steadman,* 179 F.3d at 368.

In the education context in the case of *Jones v. Collins,* 132 F.3d 1048, 1052-55 (5th Cir.1998), a former principal who was transferred to position of assistant principal at another school brought an action against the school district and superintendent alleging violation of the First Amendment right to free expression.   The Court held that the superintendent's alleged

retaliation against the principal for perceived public statement was not a First Amendment violation where the principal denied making such statement and principal's silence on particular issue was not protected expression.

Likewise, in this case, Plaintiff has repeatedly denied the speech upon which her claim is based. Plaintiff claims that she was retaliated against for the actual and/or perceived exercise of her right to speak. Yet, there are no allegations of any actual speech. The perceived public speech claim referenced in Plaintiff's Complaint is based on an October 6, 2004 Letter of Concern signed by some Hopwood Junior High School (HJHS) staff who were concerned with the performance of Ms. Beth Nepaial, the vice-principal of HJHS.

Plaintiff claims that Defendant Brewer engaged in retaliatory conduct culminating in the non-renewal of her employment contract based on a belief that she was "responsible for drafting, circulating or encouraging others" to sign the letter of concern. Plaintiff Complaint Paragraph 12. Yet, the Complaint acknowledges that Plaintiff was not responsible for "letter of concern". The Complaint states, "After being made aware of this letter, Mr. Brewer formulated the **_erroneous_** belief that Ms. Black was responsible for drafting, circulating, and/or encouraging others to sign it" (emphasis added). Plaintiff's Complaint Paragraph 12. Of course, erroneous indicates that Plaintiff was not involved in the petition.

In her deposition, Plaintiff stated that she told Mr. Brewer ". . . I explained to him that I didn't write it and I hadn't even signed it  . . ." Plaintiff Depo Transcript p. 67 Line 20-21. Moreover, she circulated letters to other staff members requesting that they confirm that she was not involved in the letter of concern. Exhibit M p. 738-741. Quite simply, Plaintiff did

not engage in any speech and a "perceived" free speech is not a viable claim under the CNMI or U.S. Constitutions.

**D.     The Speech Must Relate To a Matter of Public Concern.**

Even if the Court finds that Plaintiff engaged in any free speech activity, her speech is not protected because it was not a matter of public concern.  A public employee's speech is protected if he "speaks as a citizen on a matter of public concern." *Garcetti,* 126 S. Ct at 1958 (citing *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968.).  See also, *Coszalter v. City of Salem*, 320 F.3d 968, 973-74 (9th Cir. 2003) (holding that an employee's speech is protected under the First Amendment if it addresses "a matter of legitimate public concern").  The U.S. Supreme Court in *Garcetti* held that the "First Amendment does not empower [public employees] to constitutionalize the employee grievance". *Garcetti*, 126 S. Ct at 1959.  The Court in *Garcetti* found that the employee's communications were not insulated from employer discipline.

The alleged speech encompassed in the Plaintiff's Complaint is simply part of an internal dispute between HJHS teachers and the HJHS administration regarding the Vice Principal's communication and management of the school.  The dispute amounts to an employee grievance that clearly "is of no relevance to the public's evaluation of the performance of" the PSS. *Coszalter v. City of Salem*, 320 F.3d 968, 973-974 (9th Cir. 2003). "[S]peech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern'." *Coszalter,* 320 F.3d at 973.  A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular

interest in the way public institutions are run.     *Ballard v. Blount,* 581 F.Supp. 160, 163 (D.C.GA 1983).

It is precisely because virtually all speech that is made in and about a public employment setting will have some public significance that we must focus upon the content, form, and context of the speech to determine whether the speech is constitutionally protected. *Ferrera v. Mills*, 781 F.2d 1508, 1514 (11th Cir. 1986).  The letter of concern dated October 4, 2004 focuses in three main areas "(1) capabilities of being the vice-principal for curriculum and counseling department (2) apparent lack of equity toward the staff she should aim to lead (3) her lack of interpersonal skills."  Kenty Declaration.  Exhibit L.   These concerns and criticisms directly relate to workplace and personnel management, which are not matters of public concern.

When the content of the speech of public employees focuses on working conditions, as here, the matter is not a matter of public concern.  *See In Roe v. City of San Francisco*, 109 F. 3d 578, 585-86 (9th Cir. 1997), (holding that police officer's memorandum disagreeing with prosecutor's decision not to file charges in case handled by officer because of prosecutor's view on legality of search did not raise a matter of public concern); *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985)(finding that police chief's opinion that village manager was incompetent did not raise a matter of public concern); *Davis v. West Commty. Hosp*., 755 F.2d 455, 460-61 (5th Cir. 1985) (ruling that a doctor's complaints about competence of other staff did not raise a matter of public concern).  *Khuans v. Sch Dist. 110*, 123 F.3d 1010, 1016-17 (7th Cir. 1997)(school psychologist's complaints about a supervisor's performance constitute private concerns); and *McMurphy v. City of Flushing*, 802 F.2d 191, 197-98 (6th Cir.

1986)(police officer's allegation of superior's misconduct did not raise a matter of public concern).

Similar to the cases noted above, the content of the "letter of concern" raises nothing more than petty employee complaints about a supervisor. The specific contents of the letter (Exhibit L) include:

- Ms. Nepaial "hardly did class observations" and "she rarely checks lesson plans". "She is not willing to admit wrongdoing and expect the staff to clean up her mess." See *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581 (7th Cir. 1992) (criticism of peer evaluation in sociology department, rights to free speech were not violated where their letters to university officials concerning peer review committee and faculty feud did not involve matters of public concern; faculty members did not have property interest in reappointment or in not being denied tenure).

- "She doesn't provide consultation and training for teachers and counselors regarding new programs being implemented". See *Saye v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862, 366 (10th Cir. 1986) (holding that the presumption falls in favor of the employer when the employee speech concerning office policy arises from employment dispute concerning the very application of that policy to the employee).

- "She has asked students as well as department heads to review individual teacher portfolios, she has allowed faculty surveys to be done at HJHS without the approval of PSS, and she is quick to write up teachers." See *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989)(employee's claim is "nothing more than [an] example[ ] of the quintessential employee beef: management has acted incompetently").

- "She is not consistent in clocking in or out during working hours." See *Metzger v. Da Rosa*, 367 F.3d 699 (7th Cir. 2004) (holding employee's complaints about coworkers alleged failure to comply with time keeping policy did not raise a matter of public concern when her motivation was to protect herself against charges about her own time keeping).

- "HJHS has adopted three kinds of school schedules." See *Finch v. Ford Bend Indep. Sch. Dist.*, 333 F.3d 555 (5th Cir. 2003) (holding former superintendents proposals to reform internal school administration did not raise matter of concern).

- "She shows a lack of equity towards the staff at HJHS" "there is favoritism towards Caucasian people like herself." <u>See</u> *Guise v. Dept. of Justice*, 330 F.3d 1376 (C.A. Fed., 2003) (holding supervisor's derogatory statements to subordinates about the competence of an associate warden did not raise to matter of public concern).

In this case, all of the issues in the letter of concern are in relation to private matters affecting the complaining employees' work as teachers, counselors and support staff such as scheduling, evaluations etc. These matters are not of public concern nor are the staff speaking as private citizens when complaints are regarding their duties as teachers and counselors. Case law from the Supreme Court, the Ninth Circuit and other circuits overwhelmingly support a determination by this Court that the letter of concern is not a public matter but an employee grievance. The issues in the letter of concern address the relationship between the staff with the vice principal rather than any public function of education.

E.    <u>Plaintiff's interest in the speech is outweighed by the school's need to operate an efficient system.</u>

If the employee's speech cannot fairly be characterized as constituting speech on a matter of public concern, the inquiry is at an end. If the court finds that Plaintiff's perceived free speech claim is viable and then finds the issues in the letter of concern are matters of public concern, Plaintiff's claim still fails. At this point, the court must balance "the interest of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); *Connick,* 461 U.S. at 149-54, 103 S.Ct. at 1691-94.

If the speech is disruptive to the employer's work environment, or will adversely affect the integrity of agency proceedings or efficient operations of business, the speech will not be

protected under the First Amendment.  <u>See</u> *Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) (hostile and assaultive speech of janitor toward others justified termination of his employment by balancing employer's interest in avoiding disruption against the janitor's interests); *Sullivan v. Ramirez*, 360 F.3d 692 (7th Cir. 2004), (employees' efforts to document working hours of colleagues was unprotected because colleagues were aware that they were being monitored by employees who lacked supervisory authority over them in violation of supervisor's instructions creating dangers of workplace disruption and presenting actual insubordination); *Sharp v. Lindsay*, 285 F.3d 479 (6th Cir. 2002) (public school principal was properly demoted after making public statements critical of the superintendent in light of the risk of disruption to what should be a close working relationship).

In *Calef v. Budden*, 361 F. Supp.2d 493 (D.S.C. 2005), a substitute teacher brought a § 1983 action alleging that the defendants denied her the opportunity to substitute teach in retaliation for exercising her First Amendment right to freedom of speech in making statements critical of President Bush and American military policy. School officials had previously received complaints about her performance, including her inability to interact with students and control her classes as well as complaints about her political views. The principal considered her statements inappropriate and recommended her removal from further substitute duties and she was allowed to substitute at other schools in the district. In granting the defendants' motion for summary judgment, the court held that the school's interests in maintaining efficient operations outweighed the teacher's right to express her political views. Furthermore, school officials would have taken the same action in barring her from further assignments even if she had not engaged in political speech.

Courts weigh the interest of the employee in commenting on a matter of public concern

against the legitimate interests of the employer in promoting efficiency of public service. Gathering and submitting petty complaints about one's supervisor as in the HJHS "letter of concern" is obviously disruptive to the operation of the school. The method that the group chose to pursue their concerns was particularly disruptive. The letter of concern was submitted to the Commissioner's Office and the Board of Education before the concerns were raised to the Principal of HJHS. Plaintiff even acknowledges that this was not appropriate. Plaintiff Depo Transcript p. 67 lines 1-8.

As a result of the "letter of concern", the administrators at HJHS, the Commissioner, and the PSS Human Resources Officer spent a considerable amount of time addressing the matter. Kenty Decl. Para.18. The Human Resources Officer over a period of two months met individually with the signatories to the letter to discuss their concerns. Kenty Decl. Para.19.

The letter significantly disrupted the working environment at HJHS. Nepaial Decl. Para.8. Both Vice-Principal Nepaial and Principal Brewer had to take time from their schedules during an important period of accreditation review to deal with the letter of concern complaining about Ms. Nepaial's role as an administrator. Nepaial Decl. Para.10. The letter of concern and public exposure damaged the professional reputations of Ms. Nepaial and Mr. Brewer and affected their ability as administrators at HJHS. Nepaial Decl. Para.9. From October until nearly the end of school year 2004-05, staff members and community members became focused on the dispute. Nepaial Decl. Para.10. The divisive environment affected HJHS's administration, teachers and staff's ability to focus on an accreditation review, which took place in the spring of 2005. Nepaial Decl. Para.10. The letter caused a great deal of stress on Ms. Nepaial personally. Nepaial Decl. Para.8. The local media got wind of the issue and published numerous articles that disrupted the school environment and damaged the

reputations of the administrators at HJHS.  Nepaial Decl. Para.9.  Accordingly, even if the letter represents protected speech, the disruption caused at the school outweighs Plaintiff's right to exercise her "perceived" speech rights.

### F. Absent Any Perceived Free Speech HJHS Junior High School Would Not Have Renewed Plaintiff's Employment Contract.

Even if the letter of concern in this case constitutes the type of communication protected by the First Amendment, there is no evidence that Plaintiff or any other teacher suffered employment consequences for the exercise of those rights. It was well known that a school counselor, Nariani Sikyang, was the leader of the group with the concerns about Ms. Nepaial. Nepaial Decl. Para.7   Sikyang Decl. Para.7 and 8.  Ms. Sikyang collected the information that constituted the letter of concern and obtained signatures of her fellow employees.  Sikyang Decl. Para.3.The letter was dated October 4, 2006.  Investigations, meetings and complaints in the media occurred from October – February of 2005 with the dispute being mediated and resolved by the Commissioner of Education in February of 2005.  Kenty Decl.Para.23.  During this process, PSS offered Ms. Sikyang an employment contract, which she signed. Sikyang Decl.Para.9.  She later retired on December 31, 2005.  Sikyang Decl. Para.10.  Even though Ms. Sikyang was the spokesperson and leader of the group of the HJHS staff that raised the concerns, Mr. Brewer asked her to return to HJHS as a working retiree.  Sikyang Decl. Para.11. Ms. Sikyang continues to work at HJHS to this day.  Sikyang Decl. Para.12.

Finally, Plaintiff's alleged exercise of free speech and the letter of concern did not cause Defendant Brewer to issue Plaintiff the non-renewal notice.  Plaintiff, who had a history of insubordination with her previous school, Koblerville Elementary on Saipan, was given only a one-year contract with HJHS.  Kenty Decl. Para.17.  At that time, most teacher contracts were for a two-year time period.  Kenty Decl. Para.19.  While employed at Koblerville Elementary

School, Plaintiff received two letters of reprimand for insubordination.  Exhibits H and I.
During April of her last school year at Koblerville, Plaintiff requested annual leave to attend a
sailing regatta. Plaintiff Depo Transcript p. 27-28.  The Principal specifically denied plaintiff's
request. Plaintiff Depo Transcript p.29 lines 6-7.   Yet, Plaintiff went to the regatta anyway and
did not report to work.  Plaintiff Depo Transcript p. 29 line 24 p.30 line1.  She resigned shortly
thereafter before the school had an opportunity to take disciplinary action.

While at HJHS, Plaintiff continued her pattern of insubordination.  PSS Regulation §
3404 defines insubordination as:

> if any employee willfully or intentionally disobeys a reasonable order of a superior or the
> lawful regulation or policy of PSS, he or she may be subject to appropriate disciplinary
> action including dismissal.

Plaintiff repeatedly ignored the instructions of her supervisors at HJHS.  Plaintiff refused
to provide substitute teaching coverage despite instructions through bulletins and notices
regarding the need for such coverage.  Nepaial Decl. Para.13.  As Acting Principal during the
month of December 2004, Beth Nepaial issued a substitution schedule for teachers.  Nepaial
Decl. Para.13.  Plaintiff received a formal reprimand regarding her refusal to provide
substitution coverage.  Exhibit N.  Plaintiff admitted that she typically received school bulletins
and that she specifically received notice regarding the substitution, but claims that she did not
read the notice.  Plaintiff Depo Transcript p.p. 105 18-21 and p. 102 lines 15-24.

Similarly, when Plaintiff received a note from the Vice-Principal requesting a meeting
after class, Plaintiff did not report to the meeting and claims that she did not read the note.
Plaintiff Depo Transcript p. 130 lines 6-23.  On April 14, 2005, Beth Nepaial asked a student to
deliver a note to Plaintiff.  Nepaial Decl. Para.16.  The note requested that Plaintiff meet with
Ms. Nepaial at the end of school that day but Plaintiff did not report to the meeting.  Nepaial

Decl. Para.16 and 17.  Plaintiff received a letter of concern from HJHS Principal Brewer regarding her failure to provide information regarding an excused absence and her failure to report to the meeting with Ms. Nepaial. Nepaial Decl. Para.18.  Exhibit R.  Plaintiff's decision to ignore school bulletins, the substitute schedule (both with instructions to provide substitute coverage) and to ignore notes from the Vice-Principal to attend meetings is insubordination.

Plaintiff received a reprimand letter dated January 11, 2005 for her failure to provide substitution coverage and her confrontation of the son of Mrs. Nepaial, a new student at HJHS. Exhibit N.  Plaintiff admits that she interrupted another teacher's class and spoke to Beth Nepaial's son in front of other students.  Depo Transcript lines p. 91.  Plaintiff asked Ms. Nepaial's son if he was afraid of Plaintiff.  Plaintiff Depo Transcript lines p. 91 lines 12-24. Plaintiff admits that she asked him about his mom [Ms. Nepaial] being afraid to send him to Plaintiff's class.  Plaintiff Depo Transcript lines p.91 lines 12-24.  Singling out a new student in this community and asking him if he or his mom are afraid of her in front of other students, demonstrated, at a minimum, poor judgment.  When considered in the context of Plaintiff's overall aggressive behavior and Plaintiff's ongoing dispute with the student's mother, her actions were unkind and inappropriate.  She decided to take out her frustrations with the mom on the son.

Plaintiff received a reprimand letter dated February 14, 2005 regarding her interruption of class time despite Mr. Brewer's instruction not to interrupt the class.  Exhibit Q.   Plaintiff admits that she was told not to interrupt instructional time. Plaintiff Depo Transcript p. 141 lines 9-13.  When discussing a complaint registered by a co-worker against Plaintiff, Principal Brewer specifically instructed Plaintiff not to discuss the issue with Ms. Greyer or interrupt class time.  Plaintiff Depo Transcript p. 145 lines 3-17.  Yet as soon as Plaintiff left Principal Brewer's Office, she went directly to co-worker Ms. Grayer's class despite Principal Brewer's instructions.  Plaintiff Depo Transcript p. 145.   Plaintiff Depo Transcript p. 145 lines 3-17.  In

fact, in Plaintiff's own transcript of tape recordings, Plaintiff states "Absolutely" when asked if she interrupted Ms. Grayer's class time despite Mr. Brewer's instructions not to.  Exhibit _____. Plaintiff's employment contract was not renewed because of her insubordinate attitude and inability to function at HJHS. Plaintiff showed a consistently failed to act as a team player and refused to follow her supervisors' reasonable instructions.

The facts alleged by Plaintiff in her complaint, even if taken as true, fail to establish that she exercised her right to speak or that such speech was based on a matter of public concern. Plaintiff's free speech claim must be dismissed because she did not engage in any speech and the law does not recognize a perceived claim.  The claim should be defeated as the "perceived" speech was not a matter of public concern.  Moreover, HJHS's interest in ensuring efficient educational services outweighs any employee's right to disrupt the educational process with petty complaints about the vice-principal.  Finally, Plaintiff's contract with HJHS would not have been renewed due to her insubordination and inability to function at HJHS regardless of any speech.

**III.    Plaintiff's Third Cause of Action (civil rights under CNMI constitution) must be dismissed as a matter of law.**

**A.  Plaintiff Had No Right To Tenure and No Property Interest in Continued Employment.**

Plaintiff contends that her due process rights were violated under Article 1 § 5 and her right to individual privacy under Article 1 § 10 of the CNMI Constitution.  In order to determine whether a plaintiff's termination violated due process rights, the Court must first determine whether plaintiff had a constitutionally protected property interest in continued employment. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Dyack v. Commonwealth of the Northern Mariana Islands,* 317, F.3d

1030, 1033 (9th Cir. 2003).   Property interests protected by the Constitution stem from an independent source, such as state law, and are not created by the Constitution itself. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 537, 105 S.Ct. 1487 (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).   In order for a property interest to exist in public employment, a person must have a legitimate claim of entitlement to the position not just a desire or unilateral expectation of it. *Roth,* 408 U.S. at 577.   A public employee does not have a property interest in employment unless a statute, rule, regulation or contract provides the employee with tenure or permanency in her employment.  *Id.*

CNMI law, PSS regulations and the terms of Plaintiff's contract demonstrate that Plaintiff has no protected property interest in her teaching post.   CNMI law provides that contracts of employment shall not exceed two years. 1 CMC § 8252(a)(8)(iii).  The law of the Commonwealth is a part of every contract. *See* 72 Am.Jur.2d *States, Territories and Dependencies* § 75 (2001). A person who contracts with the Commonwealth is chargeable with knowledge of the statutes that regulate its contracting powers and is bound by them. *Id.*  It is generally held that officers of a government may not enter into contracts that exceed statutory authority. *Id.* §  72. In the same vein, "no employee has a vested contractual right to continue employment beyond the time or contrary to the terms and conditions fixed by law." *Berstein v. Lopez,* 321 F.3d 903, 905 (9th Cir.2003)(quoting *Miller v. State,* 18 Cal.3d 808, 813 (1977)). Statutes controlling the terms of employment cannot be circumvented by contract. *Id. See Kelly v. Ogata,* 120 F.Supp.2d 1244, 1250 n.6 (D.Haw.2000).

The Regulations for the PSS Employment of Certified Personnel provides:

> §1501:  No employee has a right to the renewal of his or her contract of employment regardless of whether or not job performance during the contract period is satisfactory.  The decision whether to extend an offer for further employment is wholly within the discretion of the Public School

System.  No tenure of any nature, express or implied, is granted to any employee.

§ 1502 Renewal. No employee or office of the Public School System is authorized to indicate, expressly or impliedly, that any employee has a right to be renewed based upon his or her contract or job performance. Insert terms of the contract and PSS PR.

Plaintiff's employment contract under terms and conditions of employment provides:

 8. CONTRACT TENURE: There are no tenured employment positions offered by PSS. This contract is only for the term stated in § 1 (c) and no right to renewal is granted, expressly or impliedly, by PSS to the Employee regardless of whether job performance during the contract term is satisfactory. An offer for continued employment is completely within the discretion of PSS.   Exhibit K.

Just as this Court found in *Hofschneider v. Demapan-Castro*, No. CV-04-0022-ARM, (D.C.N.Mar.I 2005) p.3(unpublished decision), the government employment contract of Plaintiff does not create a property interest in continued employment.  PSS regulations and Plaintiff's employment contract clearly provide that employees do not have a right to renewal of their employment contracts or tenure.  Absent tenure, Plaintiff did not have a property interest in continued employment with HJHS or PSS.  Plaintiff's completed the term of her contract with HJHS and was compensated for her work.  As a non-tenured contract employee, she was not entitled to a renewal of her contract or a due process hearing regarding the non-renewal.

**B.      Plaintiff's liberty interest was not implicated by reason of HJHS Junior High School's recommendation not to renew Plaintiff's contract.**

An employee's liberty interest is implicated when there is public disclosure of a stigmatizing reason for the termination of a public employee.  *Board of Regents v. Roth,* 408 U.S. at 573, 92 S.Ct. 2701.  In *Matthews v. Harney County,* 819 F.2d 889, 891 (9th Cir.1987),

the Ninth Circuit found that a "liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality....". However, "an employee must show that '(1) the accuracy of the charge is contested;  (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment'. *Mustafa v. Clark County School District*, 157 F.3d 1169 (9th Cir. 1998) citing *Matthews*, 819 F.2d at 891-892.  See also, *Cox v. Roskelly*, 359 F.3d. 1105 (9th Cir.2004).

In order for an employee's liberty interest to be implicated, there must be public disclosure of a stigmatizing reason for the disciplinary action against the employee. *Roth,* 408 U.S. at 575.  In *Roth*, a professor who had no tenure rights and was not rehired after first year alleged that the decision not to rehire him infringed his Fourteenth Amendment rights. The Supreme Court held that where the state did not make any charge against professor that might seriously damage his standing and associations in his community and there was no suggestion that state imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.  It stretches the concept of a liberty interest in public employment too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another. *Roth,* 408  U.S.  575 citing *Cafeteria and Restaurant Workers* v. *McElroy*,  367 U.S. 886, 895-896, 81 S.Ct. 1743,  1748-1749, 6 L.Ed.2d 1230 (1961).

In this case, Plaintiff has failed to allege any facts regarding Plaintiff's liberty interest being implicated or any public disclosure of stigmatizing conduct.  There is no allegation that the reasons for the Principal's decision not to renew Plaintiff's contract, including the letters of reprimand and performance appraisal, were publicized.  Plaintiff's grievance hearing before a

panel of Board members was not open to the public.  Guerrero Decl. Para.11.  Plaintiff's

personnel file is not public information.  CNMI law that prohibits public disclosure of personal

information contained in personnel files.  1 CMC § 9918(a)(2).

**C.   Even if any due process rights exist, Plaintiff received due process when the Board heard her grievance regarding her ,performance evaluation and letters of concern and reprimand issued by Principal Brewer.**

Due process was afforded to Plaintiff through the appeal of her employee grievance to

the Board of Education.  On May 19, 2005 Plaintiff filed a formal grievance and complaint

against Jim Brewer.  Exhibit M.  On July 15, 2005, the Commissioner of Education issued her

decision regarding the grievance. Exhibit M.  On August 15, 2005 Plaintiff filed her notice of

appeal of the Commissioner's decision with the Board of Education.  Exhibit M.

In accordance with PSS regulations, the appeal was heard by a panel of three Board of

Education members on September 22-23, 2005 with Plaintiff being represented by a Eric

Bozman of the O'Connor, Berman, Dotts and Banes office.  Exhibit M.  The Commissioner's

Office was represented by Heather Kennedy, PSS Legal Counsel.  Exhibit M.   Assistant

Attorney General, Jeanne Rayphand, provided legal advice to the hearing panel.  Guerrero

Decl. Para.10.  On November 9, 2005, the Board issued a decision in the matter.  Exhibit M.

The hearing was closed with both parties afforded the opportunity to present evidence

and cross-examine witnesses.  Guerrero Decl. Para.11.  Plaintiff declined to offer any

testimony to support her appeal.  Exhibit M.  p.1672. At the conclusion of the hearing, both

Plaintiff and the Commissioner's Office were provided the opportunity to submit proposed

findings and comment on the Board's Proposed findings and conclusions in accordance with

the CNMI Administrative Procedures Act.  Exhibit M. p.1708-1724, p.1687-1692. The Hearing

Panel considered 11 issues raised by Plaintiff.  Exhibit M. p. 1672-1674. Under issue 4, the

Hearing Panel specifically considered the letters of concern, the formal reprimands, the

performance appraisal and the non-renewal of Plaintiff's teaching contract.  Exhibit M p.1673.

The Panel found that the letters of reprimand, the letters of concern, and the performance

appraisal were all justified and substantiated. Exhibit M.

    The panel also specifically found that Plaintiff did flick the ears and push the heads of

students and found her claim that she engaged in the conduct as part of a class unit not

credible. Exhibit M.  P. 1676.  The panel found that Plaintiff disobeyed her supervisor

instructions warranting the letters of reprimand dated January 11, 2005 and February 14, 2005.

p. 5 and p.6.  The grievance process and appeal afforded Plaintiff due process rights if any such

rights existed.

**D.     Plaintiff has failed to establish any invasion of privacy claim.**

    In the Third Cause of Action, plaintiff claims she was deprived of rights guaranteed by

the Constitution of the Northern Mariana Islands including her right of individual privacy

under Article 1 § 10.  Other than a single reference to the CNMI Constitution regarding an

invasion of privacy, no other allegation in Plaintiff's complaint suggest an invasion of her

privacy.  The CNMI Constitution, Section 10 under Privacy states, "The right of individual

privacy shall not be infringed except upon a showing of compelling interest."  In discussing the

"fundamental constitutional right to individual privacy" guaranteed under section 10, the

framers emphasized:

> The right of individual privacy guaranteed by this section is not absolute …
> This constitutional provision recognizes the necessary balance between the
> individual's right to privacy and the public's right to protect and promote the
> health and safety of the community … Each individual makes a compromise

when that individual chooses to live with others and to enjoy the benefits of society.   .

Constitutional Analysis p 24-25.  Case law in the CNMI has focused on unreasonable search and seizure in relation to individual privacy. See *Commonwealth v. Aldan*, 1997 MP 31, 5 N.M.I. 139 (1997) and confidentiality of court records. <u>See</u> In re Estate of Hillblom (Superior Ct. Order Regarding Sealing of Claims) Civ. Action No. 95-0626 (1995).  These cases set a standard that Plaintiff cannot meet.

**IV.     PLAINTIFF'S FOURTH CAUSE OF ACTION CLAIMING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DISMISSED.**

The Plaintiff has not alleged any facts that the Defendants' conduct was so extreme or outrageous as to cause her severe emotional distress.  The Restatement of Torts § 46 comment (h) notes that it is 'an important duty of the courts to guard the gateway to the cause of action for intentional infliction of emotional distress." The Comment continues: "it is for the court to determine, in the first instance, whether the defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery . . ."   Courts must exercise their review of these claims or the standard of outrageous will be expanded into an unreviewable jury question, diluting the importance of the cause of action and the available relief. *Keiter v. Penn Mutual Ins. Co*., 900 F.Supp 1339, 1348 (D.Haw.1995).

To maintain a cause of action of in the CNMI, Plaintiff must show (1) that the conduct complained of was outrageous; (2) that the conduct was intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. See *Arriola v. Insurance Company of North America*, 2 C.R. 113, 121 (Com.Tr.Ct. 1985), citing *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 at 1273 (10th Cir. 1979);

§ 46 of the Restatement of Torts provides:
One by extreme and outrageous conduct intentionally or recklessly cause severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other result from it, for such bodily harm.

Plaintiff has not alleged any outrageous conduct on the part of the Defendants. Plaintiff's complaint merely states: "The acts of Mr. Brewer and/or PSS as described above, were done willfully, maliciously, outrageously, deliberately and purposefully." Plaintiff's Complaint Paragraph 38. The acts described earlier in Plaintiff's Complaint allege, in conclusory fashion, intimidation and harassment and violations of constitutional rights based on Plaintiff receiving a less than favorable evaluation and a notice of non-renewal of her employment contract. In Plaintiff's Response to Defendant PSS's Interrogatory No. 1 regarding acts or omissions by PSS employees causing Plaintiff's damages, Plaintiff merely claims retaliation, selective enforcement of policies, negative performance appraisal and wrongful termination. Even if taken as true, these employment actions do not approach the level of outrageous required to establish a claim. The commentary to Restatement § 46 states that:

> d. *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree if aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to atrocious, and utterly intolerable in a civilized community. Generally, the ease is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Claims of intimidation and harassment and angry words exchanged between a supervisor and his employee do not "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community". *Thomas v. Douglas,* 877 F.2d 1428 (9th Cir. 1989)(citing *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585

(1987)).  In *Thomas*, the Ninth Circuit held "liability for intentional infliction of emotional distress 'does not extend to mere threats' because 'some safety valve must be left through which irascible tempers may blow off relatively harmless steam'".

Indeed, courts throughout the nation have dismissed cases of intentional infliction of emotional distress in the employment context.  See, *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995) (discriminatory comments about the plaintiff's pregnancy and gender, criticism of her attitude and work product, rumors about her lack of work ethic, and the unlawful termination claims did not constitute a viable claim for intentional infliction of emotional distress); *Hirschheimer v. Associated Metals & Mineral Corp.*, 1997 U.S. Dist. LEXIS 12838, 1997 WL 528057 (S.D.N.Y.1997) (Not Reported)(six-month campaign of harassment did not amount to extreme and outrageous conduct necessary to establish an intentional infliction of emotional distress claim); *Strasburger v. Board of Educ., Hardin County Community Unit School Dist. No. 1, 143* F.3d 351 (7th Cir. 1998), reh'g and suggestion for reh'g en banc denied, (June 26, 1998) and cert. denied, 1999 WL 8065 (U.S. 1999)(teacher terminated amidst rumors of sexual misconduct failed to establish intentional infliction of emotional distress claim despite his contentions that the reasons for his termination was pretextual and that school board defamed him); *Lupo v. Wyeth-Ayerst Laboratories*, 4 F. Supp. 2d 628 (E.D. Tex. 1997)(employee's claims that his sales figures were altered by employer to cast him as an incompetent and ineffective, and threat to subpoena employee's current employer for his personnel records if he refused to produce them voluntarily did not meet threshold requirements for cause of action); *Murphy v. American Home Products Corp.*, 448 N.E.2d 86 (N.Y. Ct. App. 1983)(upholding dismissal of intentional infliction of emotional distress claim because  plaintiff's allegations that he was demoted for reporting fraud, informed he would never advance because of his age, discharged, ordered to leave immediately, forcibly and publicly escorted from the workplace by company guards, and subjected to having his belongings dumped into the street, fell "far short" of the standard of conduct necessary to establish a cause of action).

Plaintiff also failed to meet the fourth element of severe distress.  Comment j. to RESTATEMENT §46 provides:  "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  Plaintiff's stress claims are based on her lack of employment.  In response to Interrogatory No. 2 requesting information regarding the nature and extent of her injuries, Plaintiff claims "stress and emotional strain associated with being terminated from her teaching positions and the attendant damage to her personal and professional reputation in the community".  In response to Interrogatory No. 12 regarding Plaintiff's alleged "severe anxiety" Plaintiff responds clearly that her anxiety is "typical."  Plaintiff states:  "the anxiety and stress that her unemployment caused were the typical sort that a person would experience when faced with the prospect of having no means by which to support themselves."  Unemployment may be stressful, but it does not approach the severe stress standard required of an intentional infliction of emotional distress claim.

Plaintiff's claim for intentional infliction of emotional distress fails as a matter law because plaintiff has not alleged any outrageous conduct by Defendants and has not suffered any actionable severe stress.  Accordingly, this Court should dismiss the Plaintiff's Fourth cause of action with prejudice.

## V.     PLAINTIFF'S FIFTH CAUSES OF ACTION CLAIMING NEGLIGENT INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DISMISSED.

Likewise, Plaintiff's Fifth cause of action fails because Plaintiff has not suffered any severe emotional distress.  In *Austin v. Terhune*, 367 F.3d 1167 (9th Cir 2004) for emotional distress claims applying 9th Circuit  law stated that a plaintiff must show "(1) serious emotional distress, (2) actually and proximately caused by (3) wrongful conduct (4) by a defendant who should have foreseen that the conduct would cause such distress." *Id.* at 618.  The Court held

that Plaintiff's claim failed because he did not satisfy the first required element.  Likewise, in this case, worrying about your future job prospects does not demonstrate severe emotional distress.

Regardless of Plaintiff's emotional distress, Plaintiff's claim should be dismissed as a matter of law because she does not have a cognizable claim under CNMI law.  First, it is questionable whether CNMI law even recognizes a cause of action for emotional distress.  In *Lee Bok Yurl. Yoon Young Byuang*, Civil Action No. 99-0085 (N.M.I. Super Ct. March 3, 2000), the CNMI Superior Court dismissed Defendant's counterclaim for negligent infliction of emotional distress  finding that the Commonwealth does not recognize such a cause of action.

Second, Plaintiff must point to a traumatic event that caused the emotional distress. The *Lee Bok Court* held that "in order to successfully allege a cause of action for negligent infliction of emotional distress, Defendant must allege that Plaintiff subjected them to a traumatic event which caused the person to fear for their own safety."  The court found that Defendants' counterclaim did not indicate a fear for their own safety.

The requirement for a traumatic event is consistent with Ninth Circuit case law.  In *Yballa v. Sea-Land Services, Inc.,* 919 F. Supp 1428, 1434 (D.Hawaii 1995), the court discussed in detail the threshold standards for a negligent infliction of emotional distress claim under the Jones Act.   The Court stated: "The Ninth Circuit appears to hold the view that under the "physical injury or impact rule, a plaintiff may not recover for emotional injury unless he also sustained an accompany physical contact."  *Yballa*. at 1435.  The *Yballa* court held that mere verbal and physical abuse by a superior did not amount to physical impact, which precluded  recovery for negligent infliction of emotional distress.  *Id.*

In this case, Plaintiff claims that the non-renewal of her contract and alleged violation of her constitutional rights caused her emotional distress.  While receiving a notice of non-renewal of an employment contract could be distressing, it does not rise to the level of a traumatic event for an actionable claim.  While unemployment carries with it a certain amount of fear, it does not equate to fearing for one's own safety.

The *Yballa* Court also determined that the Plaintiff could not recover under the "zone of danger" rule, which the Court relied on from the following employment cases:

> *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114, 114 S.Ct. 2396, 2402, 2411-12, 2416, 129 L.Ed.2d 427 (1994) (in *Carlisle* portion of case, plaintiff working for abusive, alcoholic supervisor suffered nervous breakdown after being forced to work 12-15 hour shifts for weeks at a time;  court held "work-stress-related claim plainly does not fall within the common law's conception of the zone of danger");
> *Capriotti v. Consolidated Rail Corp.,* 878 F.Supp. 429, 433 (N.D.N.Y.1995) (plaintiff's allegations that employer negligently instructed him " 'to work long hours and under stressful conditions' " thereby aggravating his heart condition failed to allege he was within any zone of danger).

Plaintiff does not meet the standard created in the above cases as her work related claim does not fall within the concept of zone of danger.

Finally, Plaintiff has not shown that Defendant created an unreasonable risk of harm or that she suffered some form of bodily injury.  In *Anderson v. Brigham Young University*, 879 F. Supp 1124, 1128 (D.Utah 1995), the Court found that Utah law and the Restatement of Torts requires that there be some physical illness or injury to recover for negligent infliction of emotional distress.   Plaintiff's complaint contains no allegations of any physical illness or injury as a result of Defendant's actions.

## VI.     PLAINTIFF'S SIXTH CAUSES OF ACTION CLAIMING BREACH OF CONTRACT SHOULD BE DISMISSED.

Plaintiff's sixth cause of action for breach of contract is unsupportable because the claim is barred by the statute of limitations and there was no breach of contract in 1997 when Plaintiff voluntarily signed a new contract and accepted a salary increase in the middle of her initial contract term.

On June 10, 1996, Plaintiff entered into an employment contract with PSS effective July 29, 1996 through July 28, 1998.  Exhibit A.  Plaintiff's annual salary pursuant to the contract was $27,437.44.  The contract also afforded employee a housing allowance of $400 per month. This amounts to $32,237.44 for the first year of the contract.

On October 21, 1996, the "CNMI Public School Reclassification and Compensation Act of 1996" became Public Law 10-35.  This law established a new salary schedule for teachers but prohibited teachers who received the pay increase from receiving "any kind of housing benefit(s) in addition to their salaries".  When Acting Governor Jesus C. Borja signed the law, he noted:

> Off-island hires will have to give up their housing allowances in order to receive this increase, but since those housing allowances are in the range of $400 to $600 per month, they too will get a net pay increase.

In 1997, PSS offered all teachers the option to enter a new contract with no housing benefits to receive the increased salary rates or remain under the current contract with housing benefits.  Kenty Decl. Para. 7 Exhibit B.   This form clearly informed Plaintiff that she had a choice to continue under her initial contract or sign a new contract and receive higher pay.   In fact, Plaintiff wrote PSS a letter on March 12, 1997 acknowledging her choice. Kenty Decl. Para. 8. Exhibit C.  In the handwritten letter, Plaintiff states that she was not ready to sign the new contract and that she had questions and planned to seek legal counsel.  Nine days thereafter, Plaintiff signed a new contract

with PSS on March 21, 1997. .  Kenty Decl. Para. 9 Exhibit D.

The term of the new contract covered March 2, 1997 through July 28, 1998.  The contract gave Plaintiff's a new salary of $38,646,74 without housing benefits.  This amounts to more than $6000 above the salary plus housing in Plaintiff's initial 1996 contract ($32,237.44).  Plaintiff's new contract afforded her higher compensation and she signed the contract and accepted its new terms, which included the cessation of a housing allowance as required by CNMI law.   Defendant PSS did not breach the 1996 contract.  Rather, the parties entered into a new contract in March of 1997 that paid Plaintiff more than the 1996 contract.

While Plaintiff did not sign the form or "waiver" as stated in the complaint, she did sign the new contract and accepted the higher compensation.  There simply was no breach of contract as a result of Plaintiff's refusal to sign the "waiver" as alleged in Paragraph 50 and 51 of Plaintiff's Complaint.

Moreover, if PSS had violated any contract term by removing Plaintiff's housing, such a claim is barred by the CNMI statute of limitations.  The CNMI statute of limitations for contract claims is set forth in 7 CMC § 2502.  This section establishes that a contract claim must be initiated within six years after the cause of action accrues.  Any breach of contract claim would have accrued when Plaintiff stopped receiving her housing in March of 1997.  This date and the date of the expiration in both her first and second contract (July 1998) are well beyond the six-year statute of limitations period.

This frivolous claim is not supported by any law or fact and must be dismissed.  A simple review of plaintiff's employment contracts, which were accessible to Plaintiff and her attorneys at any time before the filing of this action, would have revealed that this claim has no

arguable basis in law or fact.  Accordingly, Defendant PSS requests that the Court dismiss Plaintiff's sixth cause of action and take such other action as the court deems appropriate.


**VII. CONCLUSION**

Based on the foregoing, Defendant PSS respectfully requests that the Court grants summary judgment for Defendant PSS against all claims contained in Plaintiff's complaint.


_____/s/_____
Heather L. Kennedy
Karen M. Klaver
Attorneys for the Public School System