# In the matter of
# Black
# v.
# Brewer, et al.

**In the District Court of the Commonwealth of the Northern Mariana Islands**

**Civil Case Number: 05-0038**

Case Review
and
Expert Report

Submitted to:

Michael Dotts, Esq.
O'Connor, Berman, Dotts & Banes
Nauru Building, 2nd Floor
PO Box 501969
Saipan, MP 96950-1969

Completed by:
Edward F. Dragan, Ed.D.
Education Management Consulting, LLC
24 Arnett Avenue, Suite 102
Lambertville, NJ 08530

October 26, 2006

**Exhibit "D"**

Black
v.
Brewer, et al.

## ASSIGNMENT

The objective of assignment is to review and analyze the administrative practices of the Hopwood High School (School) pertaining to staff supervision including observation, evaluation, job performance, and contract renewal as they relate to actions taken regarding Ms. Lisa Black by Mr. Jimmie Brewer, Principal.

The goal of the review and analysis is to formulate and present an opinion as to whether the non-renewal of Ms. Black's teaching contract constituted an administrative decision that was reasonable under the circumstances.

Documents reviewed include, but are not necessarily limited to, pleadings, School policies and procedures, general and statistical information pertaining to the School, the personnel file of Ms. Lisa Black, the personnel file of Mr. Jimmy Brewer, and the personnel file of Ms. Beth Nepaial, Assistant Principal and deposition transcripts.

All opinions expressed in this report are based upon my review of the documents listed in the Consultant Methodology section below and by applying my education, training, and experience in school administration including teacher supervision, observation, and evaluation and are within a reasonable degree of professional certainty in the fields of education and education administration and supervision.

## QUALIFICATIONS OF CONSULTING EXPERT

The formulation of my opinions is based in part upon my education and background.  My education includes a bachelor's degree in education, master's degree in special education with a focus on supervision of teachers and the administration of programs and services, a doctoral degree in education

administration and supervision with a focus on the development and implementation of policies and procedures regulating teacher observation, supervision, and evaluation, and a master's degree in education law. Additionally, my opinion is based upon qualifications gained through my professional experience in the education and administration fields. This experience includes superintendent of a public school system where I was responsible for the implementation of policies and development of procedures regarding the observation, supervision, and evaluation of teachers. I also worked as a manager of the Division of Programs and Services in the New Jersey State Department of Education. In this position, among other duties, I was responsible for hiring, supervising, evaluating, and promoting highly trained administrative staff members. This process included the development of supervisory and evaluation standards and procedures. In this position, I responded to questions from school administrators, including superintendents and principals regarding the standards for the development of appropriate teacher observation, supervision, evaluation, and contract renewal standards.

Currently, I provide consultation to public and private schools regarding issues of general school administration, administration of student support services, development and review of school policies and procedures regarding the allocation of human resources, and federal and state compliance regarding student programs and services. I am also an adjunct professor in the department of Educational Administration and an adjunct professor in the department of Special Education at the College of New Jersey. In these positions, I instruct graduate level students regarding staff observation, supervision, evaluation and contract renewal in the context of applicable state statutes and regulations. In addition, I have authored numerous articles for peer-reviewed journals regarding educational administration, staff and student supervision and school law issues effecting school Schools and school administrators.

In addition to the above qualifications gained through my education and experience, I have been court qualified as an education, education administration and supervision, special education, special education administration and supervision, student supervision, and school liability expert in numerous federal, state, and administrative courts around the country.

## CONSULTANT'S METHODOLOGY

Before developing my opinions and before I prepared this report I reviewed the following documents:

1.    Complaint;
2.    Answer to Complaint;
3.    Commonwealth of Saipan School Code
4.    Policies of the Public School System;
5.    Personnel file of Lisa Black;
6.    Personnel file of Jimmy Brewer;
7.    Personnel file of Beth Nepaial;
8.    Deposition transcript of Lisa Black;
9.    Deposition transcript of Jimmy Brewer;
10.    Deposition transcript of Charley Kenty; and
11.    Deposition transcript of Rita Inos.

## SUMMARY OF OPINION

It is my opinion, based upon a reasonable degree of certainty in the field of education administration and supervision that the School, through its employees, and Mr. Brewer in particular, failed to apply appropriate professional standards regarding the observation, supervision, and evaluation of Mr. Black. Further, it is my opinion that the non-renewal of Mr. Black's teaching contract constituted a situation within which Ms. Black was discriminated against by not being treated equally as evidenced by the School's failure to follow its own policies regarding the supervision of teachers. As such, Ms. Black was treated in a way differently than other employees in the School and was discriminated

4

against. The lack of process, both of the School and within the standard of professional practice in the field of education administration and supervision makes me highly suspicious and raises the question of a pretext to cover some other motivation for her non-renewal.

I base this opinion on the following:

1.    Ms. Black was qualified and experienced in order to effectively teach in the School;

2.    The School breached its written policy requiring administrators to provide an opportunity for teachers to follow a corrective action plan should deficiencies arise during observation and supervision; and

3.    Information contained in Ms. Black's personnel file does not justify the failure of the School to provide appropriate supervision and does not justify Mr. Brewer's recommendation that her contract not be renewed.

## DISCUSSION

The discussion section of this report presents information upon which I make the above opinion. The discussion begins with a review of the elements of school administration, teacher evaluation, and teacher supervision, student ratings used for teacher evaluation, and teacher dismissal or contract non-renewal. This section continues with a discussion of the Commonwealth of Saipan School Code and Public School System (PSS) policies pertaining to teacher observation, supervision, and evaluation. Next, this section presents information pertaining to Hopwood Junior High School. In addition, this section presents a summary of the employment history of Ms. Black including results of recommendations and evaluations by school administrators.

**Elements of School Administration and Teacher Supervision.**

The primary purpose of teacher supervision is to improve teachers' link between the curriculum of the school and the learning experienced by the student. The teacher's personality, knowledge of the subject matter,

understanding of the students' social and psychological make-up, and teaching skills are critical components of good teaching. They are among many variables influence the teacher's effectiveness in delivering the curriculum at the classroom level.

How supervisors work with the teacher determines the skills and attitudes that the teacher will emphasize in the classroom.

The evaluation of teachers should be tailored, when possible, to their progress and personal development.  New teachers may respond to a direct identification of desired skills in evaluation, whereas mature teachers may need a more indirect approach to assessment.  The approach taken by the supervisor *should be* modified based upon the experience and skill of the teacher.

The focus for all supervisory evaluations *should be* the assessment of classroom teaching that leads to student achievement.  Through this, the supervisor will ultimately learn of the effectiveness of the school programs at the classroom level.

Three major ideas govern the evaluation of teachers in the classroom.

- The teacher needs to see him or herself as part of the curriculum, not apart from it.
- The teacher needs to understand the intent of the planned program as well as its structure.
- The teacher must clearly perceive evaluation and staff development as part of a program improvement effort.

Evaluation of classroom instruction must be based upon some understanding of what is supposed to happen to students in the planned learning experience.  The focus is on student achievement and progress made in the curriculum through planned learning experiences.

School administrators use forms in their evaluations that are standardized according to the identified goals and needs of a particular school.  Many lists of

teacher behaviors are included in school-based teacher evaluation forms. The
following is a list of eight categories suggested by Wiles and Bondi (2000) that
could be used to construct such an instrument. The critical question, for
administrators, is which of these performances actually contribute to the purpose
of the curriculum or student achievement.

- Dependability.
- Human relations skills.
- Managing the classroom.
- Planning instruction.
- Implementing instruction.
- Knowledge of subject matter.
- Assessing and evaluating students.
- Professionalism.

Along with the task of improving instruction for students, the supervisor is
often asked to be an evaluator of the teacher as well. Most evaluation sessions
in today's schools will be conducted with a guiding instrument and will use the
clinical supervision techniques developed by Goldhammer in the 1960s.
Conferencing between the supervisor and the teacher is the cornerstone of the
clinical supervision technique. Such conferencing is important since it may
represent the only opportunity the supervisor will have to engage the teacher in
professional dialogue.

In the clinical supervision model, which is widely utilized as a standard in
the field for teacher supervision, both supervisor and teacher are assumed to be
knowledgeable about the teaching act and to communicate as colleagues. In this
model, the role of the teacher is to identify their concerns in the classroom. The
role of the supervisor is to provide assistance in addressing those concerns, and
improving the teacher's performance. The clinical supervision model usually
employs a five-step process. These include the following:

1. Preobservational conference for orientation;
2. Observation by the supervisor;
3. Assessment by the supervisor and selection of an area of emphasis;

7

4.    Conference featuring an exchange of views and feedback; and
5.    Postconference analysis by the supervisor.

Variations in this procedure over the past forty years have included attempts to plan micro-teaching sessions for the teacher, to define teaching in terms of competencies, to employ peer supervision sessions among teachers, to make supervision a "team" function, and to place the responsibility for evaluation in the hands of other teachers. Whatever the form, there are several common purposes to most supervisory conferences.  They include the following:

- To enhance the relationship between the supervisor and teacher;
- To provide the teacher with feedback about his or her performance;
- To promote further understanding of the act of teaching;
- To stimulate exploration of new strategies of teaching; and
- To encourage personal teacher growth in skills, behaviors, and attitudes. (Wiles, 2000)

Whereas a personnel evaluation is designed to assure that teachers meet acceptable levels of performance, the purpose of supervision is to help teachers improve their teaching and identify goals for personal improvement.  Supervision is also designed to ascertain the degree to which the school's curriculum is being implemented and instructional goals are being achieved.  Supervision is a relationship focused on improvement of instruction leading toward improved student achievement.

**Teacher Evaluation.**

Teacher evaluation is important to ensure that school goals regarding instruction for students are met.  Without the evaluation of teachers and other support staff, one of the main variables in the accountability of the education system would be missing.  Data gathering through evaluation can be used to establish staff development objectives either for individual teachers or for groups. A systematic evaluation process also provides the documentation required to satisfy due process in the case of teacher dismissal.  It is important to note that it is standard professional practice that appropriate and adequate supervision be

8

employed by the school administrator prior to making decisions regarding teacher dismissal.

All personnel evaluation systems are variations of one of three basic systems: (1) narrative, (2) checklist, and (3) performance objectives. The following are specific purposes for evaluation systems:

- Improve instruction;
- Provide information for staff development;
- Demonstrate accountability to the board or patrons;
- Facilitate retention, assignment, and nonrenewal decisions;
- Provide information on teacher salaries;
- Validate the selection process;
- Identify conditions that would increase teacher effectiveness;
- Improve teacher performance;
- Promote cooperative relationships between teachers and administrators;
- Ensure that district and building goals are met;
- Recommend probationary teachers for tenure or continuing contract status;
- Select teachers for supervisory or administrative positions; and
- Provide information for reductions in force.

Prior to considering the dismissal of a teacher it is standard professional practice in the field of education administration and supervision for the administrator and/or supervisor of the individual to consider the following criteria:

- Was the teacher adequately warned of the consequences for his/her conduct? Was adequate documentation made of these actions?
- Was the district's policy, rule, or order reasonable?
- Was the teacher aware of the district's policy or rule, and was it explained to the teacher?
- Was an investigation completed prior to administering the discipline? If so, describe the process.
- Was the investigation fair and objective? How can you prove it?
- Is there substantial evidence or proof of guild? If so, what?
- Were the rules, orders, and penalties applied evenhandedly and without discrimination to all staff members throughout the year in this and earlier situations?

- Was the measure of discipline reasonably related to the seriousness of the infraction and the past record?  (Will, 2001)

It is important to note that the policies and rules of the school must be reasonably associated with the implementation of the school curriculum and focused on the attainment of student achievement.

**Student Ratings Used For Teacher Evaluation.**

Student ratings can add a valuable component to the range of input for the evaluation of teachers.  Although many question the validity of such ratings, under certain conditions, results can and should be useful.

Student ratings of instruction are widely used as a basis for personnel decisions and faculty development recommendations in postsecondary education.  Student ratings refer to those in which students are asked to complete a form or write a short free-form evaluation anonymously, either during or immediately after a class period, the final exam, or a session after grades are issued.

It is important to note that student ratings of their teachers or instructors are often part of an evaluation and rating system used in colleges and universities where students are cognitively able to understand the relationship between good teaching and student achievement.  It is not the a standard of professional practice for such ratings to be completed by students at the elementary or junior high school level since students are not generally able to draw inferences between how a teacher instructs a class and their own academic achievement.  Often, student rating forms ask many questions about matters that students do not appear to be in any position to judge reliably.

The possible lines of argument for the validity of student ratings become invalid if the rating form used is not appropriate for the specific data collection required.  Most forms, when used in the most common ways, are invalid as a

basis for personnel action. For example, many forms used to make personnel decisions ask question that may influence the respondent by mentioning extraneous and potentially prejudicial material such as questions about the teacher's personality.

The validity of student rating forms is also dependent on the context of how and when they are administered. For student rating results to be valid, they must be obtained through properly administered tests, stringently controlled data collection, and thorough analysis of test results.

**Teacher Dismissal or Contract Non-renewal.**

The dismissal or the non-renewal of the contract of a teacher is never easy because it has both organizational and personal implications. At the organizational level, the administrator must follow appropriate due process procedures required in termination, as well as deal with the organizational effects of losing a staff member. On the personal level, administrators are faced with the unpleasant task of telling teachers that they are not competent while trying to help them deal with the realities of the situation in a professional manner. The staff dismissal process is made much easier if the administrator has an established, comprehensive personnel system. Such a system will help to ensure that competent staffs are hired initially and that they are systematically evaluated and assisted in overcoming deficiencies in performance. In such a system, the need to dismiss staff is greatly reduced. Without adherence to such a system administrators may find it easier to simply dismiss a teacher rather than appropriately supervise him or her.

**Commonwealth of Saipan School Code.**

In the Commonwealth of Saipan School Code the term "School Administrator" means school principal or school vice principal employed by the Public School System (PSS) and has the primary responsibility as an administrator and educational leader, ensuring equitable educational services to

all students by implementing policies, procedures, and regulations as set forth by the Board of Education.

The Code specifies that the term of employment contracts for certified personnel shall be for a two year term; however, in special circumstances the Commissioner may approve a contract for a lesser term. It is important to note that although Ms. Black was determined to be competent by virtue of the fact that she was hired at Hopwood, she received a contract for less than a two-year term. There is no evidence in the record that the Commissioner approved a contract for Ms. Black for a lesser term.

Further, the Code indicates that no employee has a right to the renewal of his or her contract of employment regardless of whether or not job performance during the contract period is satisfactory. The decision whether to extend an offer for further employment is wholly within the discretion of the PSS. No tenure of any nature, express or implied, is granted to any employee. (§ 1501)

The PSS will notify the employee in writing at least ninety (90) calendar days in advance if it intends to not renew that employee's personnel contract. (§ 1504) The PSS breached its standard in this regard and failed to notify Ms. Black in writing at least ninety (90) calendar days in advance that it intended to not renew her contract.

The Code specifies that a teacher must possess detailed knowledge and understanding of the subject matter to be taught, be able to communicate effectively with his or her students and must effectively teach the assigned subject matter to the students. (§ 3401) Ms. Black's personnel record fails to indicate that she did not possess detailed knowledge and understanding of the subject matter she taught or was unable to communicate effectively with her students.

The code specifies that a teacher must use due care to organize materials, prepare for classes, maintain harmony in the classroom and school grounds and employ effective teaching techniques to ensure that the assigned teaching goals are met. (§ 3402)   Ms. Black's personnel record fails to indicate that she did not use due care to organize materials, prepare for classes, maintain harmony in the classroom or employ effective teaching techniques.

An employee must attend his or her regularly scheduled classes, remain at the school during preparation periods, attend in-service meetings as scheduled, arrive promptly at his or her workplace and attend other required functions, such as evening open houses.  An intentional disregard of repeated directives to attend or continuous tardiness despite repeated directives to be prompt may result in dismissal from employment. (§ 3403)  Although there was some reporting that Ms. Black needed to be corrected on an occasion, there is no indication in the record that her actions were an intentional disregard of repeated directives.

An employee is expected to carry out the announced policies and programs of PSS.  While policies which relate to the employee's duties are under consideration, the employee may, and is expected to, express his or her opinions concerning its merits.  However, once a decision has been rendered by a person with authority, the employee will be required to unreservedly assume the success of the program or policy which he or she is responsible to effectuate. (§ 3404 a.) It is noted that Ms. Black expressed her opinions concerning school matters in a direct and forthright manner.

If an employee willfully or intentionally disobeys a reasonable order of a superior or the lawful regulation or policy of PSS, he or she may be subject to appropriate disciplinary action, including dismissal. (§ 3404 b.)  Although it is alleged by the School that Ms. Black intentionally disobeyed an order of a superior, there is nothing in the record that justified her dismissal in the form of

the non-renewal of her teaching contract at Hopwood, given her overall performance as a teacher.

According to Rita Inos, Commissioner of Education, a non-renewal notice must be issued by an employee's supervisor 90 days prior to the contract ending. (Inos: 8)

**Information and Policies Pertaining to the Public School System.**

Information pertaining to the School was obtained by reviewing the deposition transcripts of Mr. Brewer and Mr. Kenty as well as reviewing public documents including School policies and procedures.

According to Mr. Brewer, only one observation per year is mandated by the contract. If the teacher is having trouble, there can be more than one observation in a year. (Brewer: 6)  The observation involves a preliminary, were Mr. Brewer would tell the teacher he was coming and what they should have available, and show them the rubric which was used to rate them. Mr. Brewer would observe, and then have a debriefing session with the teacher where they would clarify points of concern, come to an agreement about a course of action, and then sign off on the form. He also occasionally conducted brief, unscheduled observations. (Brewer: 8-9)  Mr. Brewer also reviews how teachers participate in meetings, and on whether they are actively involved. (Brewer: 10)  It is important to note that a review of the record failed to indicate that Mr. Brewer met the standard of professional practice with regard to the observation of Ms. Black. Neither Mr. Brewer nor any other administrator met with Ms. Black prior to any observation, either informal or formal in order to show her the rubric to be used to rate her.

Mr. Brewer stated that he could identify a teacher who had not complied with standards via: "...true classroom observation. It could be that they didn't sign a report on time. It could be they didn't show up for meetings. That they don't

come to work on time." (Brewer: 33)  Signing a report on time, showing up for meetings, and not coming to work on time does not directly relate to the implementation of the school curriculum and student progress.  Nothing in the record indicates that the School, through its employees, including Mr. Brewer, determined the effectiveness of Ms. Black's teaching in terms of communicating the curriculum and student progress.

According to Charley Kenty, Human Resource Officer, the PSS leaves the choice of best practice for evaluating teachers up to the individual principal, who can perform the evaluation himself, designate a vice principal or a teacher to do it, or utilize the students. (Kenty: 60-65)  It is limited to the principal's discretion to use student evaluations in evaluating a teacher. (Kenty: 63)  However, Mr. Kenty later stated that the PSS never encouraged principals to use student evaluations, and he had never heard of it being done. (Kenty: 65-66)  "There is no specific policy with the practice that goes to conduct in formal evaluations." (Kenty: 66)

Ms. Inos indicated that the school has written rules and procedures for teacher evaluations (Inos: 96) and that the principals meet each month to discuss best practices. (Inos: 98)  However, it is important to note that when asked about her understanding of best practices she indicated the following:

> "… I don't know what best practices you've heard about, but best practices, in my definition, is practices are things to produce positive results. They're not necessarily researched or evidenced by true research findings. These are best practices. You try them out. They seem to work, and so—and over time, you're looking at that as a possibility of being a good practice." (Inos: 95)

It is important to note that Ms. Inos, the Commissioner of Education, did not recognize best practices in the field of education administration.

Although the policy of the PSS is to never encourage principals to use student evaluations of teachers to influence the administrator's professional evaluation of a teacher, Mr. Brewer indicated that he did use student evaluations to influence his opinion of Ms. Black as evidenced by the following exchange at his deposition:

> Q.   Have you ever used students' evaluations in the –students' ratings in the—in your evaluation process?
>
> A.   I've used information from students that were not evaluations of teaching ability. I've used information from students to measure a teacher's classroom performance.
>
> Q.   Okay. When have you done that?
>
> A.   I only did it with Lisa in (indiscernible)
>
> Q.   Okay. Have you done it in regards to any other teachers?
>
> A.   One. We talked about Harnsen. (Brewer: 93)

According to Ms. Black, there were very different standards for different teachers, based on personal favoritism, regarding how school rules were enforced. Some teachers were not required to sign out before leaving and could interrupt other teacher's classes with impunity. Any questioning of this was considered an insult by Mr. Brewer and Ms. Nepaial. (Black: 5)  It is important to note that Mr. Brewer treated Ms. Black differently than other teachers in the school by encouraging and allowing a situation wherein students wrote their perceptions of her as a teacher.

Ms. Inos indicated that speakers from the Department of Education of Hawaii come to the school to present training on leadership that there were no speakers who discussed how to properly evaluate teachers.  The school only discussed that in the context of its own internal curriculum instruction division. (Inos: 107)

**Employment History of Lisa Black.**

Ms. Black's personnel file was reviewed and documents were analyzed in order to render an opinion as to her qualifications and effectiveness as a teacher. Ms. Black's training and experience were reviewed as well as references and recommendations and results of formal supervisor observations and evaluations. Also, other documentation that was provided was reviewed in order to identify other aspects of Ms. Black's training, experience, and other aspects of teaching that can be considered significant in terms of her qualifications and effectiveness as a teacher. The following charts organize and summarize information that is reasonably related to Ms. Black's qualifications and effectiveness as a teacher based upon the material provided for review.

References and recommendations were written by individuals with personal knowledge, through observation, of Ms. Black's competencies as a teacher. These are summarized here.

### References and Recommendations

| Date | Name of Author | Statement(s) |
|------|----------------|--------------|
| June 8, 1994 | Robert L. Harris, Leeds Elementary School, Elkton, MD | Lisa has taught in this particular building for two years. In my judgment, she understands both students and the learning process in regard to physical education. She has creative imagination that allows her to make classroom work interesting to students. |
| June 17, 1994 | Not known (page two missing). | I found her job performance to be effective. During the instructional time one would observe her working diligently with the students; she was knowledgeable of her |

| | | |
|---|---|---|
| | | area, Physical Education, and applied the skills during instruction with ease. She was patient with the children and capable of applying tender loving care when needed for these students of special needs. Although lessons were presented with expertise I was concerned with Miss Black's written plans. |
| June 18, 1994 | Robert L. Poole, Newark, DE | It is without any hesitation or reservation that I recommend Lisa to you. She is very capable of being an excellent addition to a school staff. She is very knowledgeable relative to her teaching areas. With her teaching experiences, she adapted very well to the secondary and elementary teaching assignments. She relates well to students of all ages. |
| April 29, 1995 | Henri Lemaire, The Universal American School. | I have known Lisa as a colleague over this last school year, and it is my sincere pleasure to recommend Lisa Black for any teaching position. She is an excellent and experienced teacher with the highest of academic standards for herself and her students. Students have learned more in one year with Lisa than they have learned over the past two years with any |

| | | other teacher. In addition to providing superior learning experiences for her students, Lisa has established work expectations that require superior effort from her students. She is a bright person with academic curiosity that is evident in the variety of academic pursuits she has made a part of her continuing education. |
|---|---|---|
| December 29, 1995 | Dale R. Koch, Universal American School. | Lisa has a genuine interest in children and their physical skill development. She brings a great deal of enthusiasm and energy to the job. She spends many long hours working with her students, teams and related organizational work in preparation for the various athletic events. She is capable of creating excellent lessons and executing them effectively. She encourages her students to work hard and reach high standards. |
| February 14, 1996 | Dale R. Koch, The Universal American School. | Miss Black is very capable of effective lessons both at the high school and at the elementary levels. Her knowledge of the various aspects of physical education at all levels is outstanding. She is very enthusiastic at both elementary and high school levels. She is |

| | | |
|---|---|---|
| | | very interested in her students and is zealous that students have a quality physical education program. |
| February 19, 1997 | Doris Ann Templeton Thompson, San Antonio Elementary School | Exceptional (upper 5%) in the following: depth/breadth of knowledge of the subject(s) currently teaching; knowledge of teaching and learning; ability to teach diverse learners without stereotyped expectations; motivation and perseverance toward pursuing own goals; tolerance for ambiguity, uncertainty; ability to work independently with confidence and little guidance; confidence in publicly expressing opinions/position on issues; ability to critically analyze proposals, policies, practices; effectiveness in defining and resolving problems; ability to plan and conduct inquiry to pursue needs/questions; and achievements relative to the degree of challenge in work setting. Rated Very Good (Next 10%) in the following: Intuitiveness and attention to nuance, subtlety; disposition and ability to work collaboratively with colleagues; ability to express ideas in writing coherently and with |

| | | |
|---|---|---|
| | | clarity; openness to ant tolerance of others' ideas; interest in school/institution and contributing toward shared goals; and interest in the families and communities served by institution.<br><br>As an educator: outstanding (comparable to the best; highest 5%) |
| July 17, 1998 | Brigida Ichihara, Principal, Koblerville Elementary School. | I am highly recommending to your office to please hire Ms. Lisa Black as a Classroom Teacher for Koblerville Elementary School. I feel that Ms. Black can make a difference at our school. |
| July 21, 1998 | Brigida Ichihara, Principal, Koblerville Elementary School. | The work of this employee is of an acceptable level of competence and she is recommended for a within-grade increase to the next salary rate. |
| November 5, 1999 | Francisca C. Ulloa, Principal, Koblerville Elementary School. | She does wonders with computers especially when she starts working with Hyper-Studio. She is constantly upgrading herself as to what is the latest in technology.<br><br>Ms. Black engages in a lot of hands on learning which I think is important. She would buy her materials/supplies for her students if the school is not able to provide. Her lesson plans are on time. Her attendance is good. |

|  |  | She is able to adjust to the culture of the school and our island as well.<br><br>She is very energetic and talented in other interests such as in arts and crafts and sailing. |
| --- | --- | --- |

Performance ratings were obtained from written evaluations of Ms. Black by her supervisors during her teaching career.  They are summarized here.

### Performance Ratings

| Date | Evaluator | Ratings and Comments |
| --- | --- | --- |
| June 13, 1997 | Doris T. Thompson | Exceptional: Quality of work.<br><br>Satisfactory: Volume of work; work habits; work attitude; and supervisory ability. |
| June 13, 1997 | Doris T. Thompson | During this time period (July 29, 1996 to August 3, 1997) Ms. Black performed her duties in an overall satisfactory manner. |
| September 30, 1998 | Brigida Ichihara | Satisfactory: Volume of work; quality of work; work habits; and work attitude. |
| August 31, 2004 | Jim Brewer, Principal, Marianas High School. | Teaching Strong Teen Life Skills.<br><br>Generally, she is doing a good job in her classroom.  "Do not see a need to revisit at this time."<br><br>Highest rating for: Speaks clearly; stays on |

| | | |
|---|---|---|
| | | topic; volume; posture and eye contact; content; and collaboration.<br><br>"Seems to have good interactional (sic) w/class – Students were responsive to questions – Really stays on track." "Well organized." "Did not provide lesson plan." |
| October 12, 2004 | Jim Brewer, Principal, Marianas High School. | Highest rating for: Speaks clearly; stays on topic; volume; posture and eye contact; content; and collaboration.<br><br>"Good discussion regarding several topics. Positive force in all her classes."<br><br>"Demonstrates master teacher skills with this class. Classroom looks good; very orderly. Explains 'constructive' criticism. Homework and day's assignment on board. Lots of small work group instruction. Students were involved/learning." |
| April 14, 2005 | Beth Nepaial, Vice Principal for Curriculum and Instruction. | Rated well above satisfactory (is frequently outstanding. Some teaching practices are demonstrated at the highest level while others are at a consistently high level. Teacher frequently seeks to expand scope of competencies and often undertakes additional appropriate responsibilities) in the |

|  |  | following areas: Designs and plans instruction; implements and manages instructions; reflects and evaluates teaching and learning; and assesses and communicates learning results.  Rated Satisfactory in the following areas: Engages in professional development and content knowledge.  Rated marginal in the following areas:  Creates and maintains climates and collaborates with colleagues, parents, and others.

"Ms. Black, thank you for your excellent lesson planning and record keeping of student progress.  Please continue to grow professionally in the areas of student discipline and collegiality." |

It is important to note that an objective review of recommendations and evaluation comments from administrators regarding Ms. Black's competencies as a teacher indicate that within a reasonable degree of certainty she provide for students to benefit from the curriculum and planned instruction for student achievement.

In March 2004, Ms. Black began working at Hopwood.  She received favorable evaluations and was regarded as competent and effective.  The School, through its administration, indicated that during the first few months of

Ms. Black's employment that she received favorable evaluations and that her relationship with Mr. Brewer was professional and congenial.

Ms. Black stated that she had conflicts with other teachers, but most were resolved without going to the administration. However, she brought one conflict with Ms. Borehoff and one with Ms. Nepaial to the attention of the administration. She also filed grievances against Ms. Borehoff and Mr. Starkey. (Black: 83)  Ms. Black also filed a grievance against Mr. Brewer. (Black: 84)

Ms. Black's complaint against Ms. Borehoff was that Ms. Borehoff would keep her students late, causing them to be later for Ms. Black's class, and for Ms. Black to worry about where they were. Ms. Borehoff said that keeping the students late was the only way to get them to finish their work, but refused to set up a system where she would send a note to Ms. Black if the students would be late. (Black: 86)  When Ms. Black wrote to Mr. Brewer about this problem, Mr. Brew first suggested that Ms. Black try to resolve it with Ms. Borehoff. When she explained that she had tried that, Mr. Brewer did not want to sit down with both teachers to resolve the issue. Instead, he sent out a general letter asking teachers not to keep the students late for another teacher's class.  There was no other follow-up. (Black: 87-89)

The grievance against Mr. Starkey resulted from him discussing a private issue Ms. Black had regarding Ms. Nepaial's son's hands. Mr. Starkey was saying that Ms. Black needed mental help. Ms. Black confronted him about this and threatened to sure him for slander if he did not stop. (Black 89-90)

During the 2004-2005 school year Ms. Black filed a grievance against Ms. Barja and Mr. Starkey.  On May 23, 2005 Mr. Kenty wrote a memorandum to the Commissioner of Education regarding the investigation of Ms. Black's grievance against Ms. Barja and Mr. Starkey.  In his conclusion Mr. Kenty stated:

> The whole situation is really about personality differences and that as long as they continue to point fingers at each other on who's at fault, we could not reach reasonable solution.
>
> It is incumbent on the school administrators to work with the respective teachers to address their personality differences.

It is important to note that Mr. Kenty, as the Human Resource Officer for PSS, acknowledged that there were personality differences that caused conflicts in Hopwood between staff members. Also, Ms. Inos made a speech to department chairpersons indicating how the staff needed to work together.

Ms. Black exercised her right to file a grievance in an attempt to resolve these conflicts that were not adequately dealt with by Mr. Brewer. Mr. Kenty admonished the school administrators at Hopwood to work with teachers to address personality differences. Mr. Kenty appropriately identified the standard of professional practice in the field of education administration and supervision that the administration of a school has a duty to supervise or "work with" teachers in order to resolve conflicts that are likely to interfere with the delivery of the school curriculum and student achievement. Ms. Inos indicated that she recalled that she made a speech in a meeting of department chairpersons about how the staff needed to work together. (Inos: 59, 61)

The record does not support that the School followed even the minimal standard of professional practice in the field of education administration and supervision when it dealt with Ms. Black. When a teacher performs in a marginal way the school administration is to develop a necessary improvement plan that addresses each area identified. The improvement plan is to address the specific weakness (es) and lead the teacher to the desired expectation. The PSS Performance Appraisal system specifically agrees with this industry standard and it is stated so on the school appraisal instrument for classroom teachers.

My review of the record indicates that the School, through its employees and Mr. Brewer in particular, breached the professional standard of practice in the field of education administration and supervision by failing to provide Ms. Black with the necessary improvement plan with a focus toward correcting areas indicated as marginal in her performance appraisal instrument.

The two areas, creates and maintains climates and collaborates with colleagues, parents, and others, are areas that the administration of the school has the responsibility to develop in each teacher.  In Ms. Black's situation, she Ms. Nepaial completed a performance appraisal of her on April 14, 2005, during Ms. Black's first year as a teacher at Hopwood.  The evaluation was completed even though Ms Nepaial had not viewed Ms. Black's class anytime prior for the purpose of supervision. Ms. Black signed the report on April 18, 2005 indicating that she had reviewed and discussed it with Ms. Nepaial. On April 20, 2005, two days after Ms. Black discussed the report with Ms. Nepaial, Mr. Brewer sent a memorandum to Mr. Kenty stating that Ms. Black's contract would not be renewed for the 2005-2006 school year.  It is important to note that there was never a corrective action plan developed at that time or at any time during the school year when the administration indicated that there was an observation of behavior on Ms. Black's part that needed to be corrected.  On April 25, 2005 Ms. Black received notice that her contract of employment would not be renewed. According to Mr. Kenty, the PSS found the decision of Mr. Brewer not to renew Ms. Black's contract to be justified after review. (Kenty: 47)

According to Mr. Kenty, Ms. Black was hired by Koblerville Elementary School in July of 1998. She was employed until June of 2002. Ms. Black received two letters of reprimand from the principal at Koblerville. (Kenty: 17)  According to Mr. Kenty, the letters of reprimand were for failing to follow regulations. (Kenty: 20)  Ms. Black resigned voluntarily (Kenty: 27) from Koblerville. Technically, she gave notice that she would not renew her contract. (Kenty: 27)  Ms. Black then applied to Hopwood Junior High School in March of 2004. (Kenty: 17)  According

to Ms. Black she had never been terminated from a teaching position or from any other job. (Black: 71)

It is important to note that Mr. Kenty indicated that nothing that happened at Koblerville indicated that Ms. Black was not qualified to teach at Hopwood. This was reviewed before she was hired. (Kenty: 30) Ms. Black's contract was renewed at least once at Koblerville. (Kenty: 38)

According to Mr. Brewer, Ms. Black did not comply with standards all of the time. (Brewer: 33) As proof, he stated that she was not complying with the standards, Mr. Brewer mentioned an incident when Ms. Black left in the middle of a staff meeting without explanation, taking the sign-in booklet with her, and another incident when Ms. Black was reluctant to move from her classroom during repairs. (Brewer: 34) Mr. Brewer indicated that no one spoke to Ms. Black regarding the staff meeting incident. (Brewer: 37) According to Mr. Brewer, Ms. Black also interrupted instruction time for another teacher and failed to substitute for one class which she was assigned to do. (Brewer: 65-66) It is important to note that leaving in the middle of a staff meeting, being reluctant to move from a classroom, interrupting instruction time, and failing to substitute for one class does not directly relate to the implementation of the school curriculum and student progress. These incidents fail to justify the School's disregard for its own policy to provide supervision within the standard of professional practice.

According to Mr. Brewer, Ms. Black's contract was not renewed due to a history of insubordination at Hopwood and at least one other school. Mr. Brewer referenced Ms. Black's time at Koblerville (before he was responsible for her supervision) where she sent a letter to the parents after being specifically instructed not to, and where she refused to turn over passwords to computers after being directly instructed to do so. (Brewer: 114-115) Mr. Brewer indicated that information that he discovered about Ms. Black when she was working at

Koblerville influenced his evaluation of her at Hopwood and played an important roll in the non-renewal of her contract. (Brewer: 119)

Mr. Brewer detailed the list of reasons which caused him to decline to renew Ms. Black's contract. They include, according to him, that she did not follow school policies and rules, that she was difficult to work and get along with, that her personality was abrasive, and inflexible, and she constantly complained, that she externalized every problem, that she questioned the authority of the administrators, that she had difficulty working as part of a team, that she had a poor rapport with the students and engaged in odd behavior in the classroom, which included: her belief in "takamona," her use of the dolls in the classroom, and her keeping students in for lunch detention, causing them to miss lunch, and that she assaulted students by flicking their ears and pushing their heads. (Brewer: 119-130)

It is important to note that any reasonable administrator under the same circumstances would review and evaluate his or her staff based upon performance in the administrator's own school during the time that he or she was the teacher's supervisor and not consider prior evaluations and circumstances. After all, Ms. Black was hired to teach in Hopwood based upon, among other criteria, her positive performance at Koblerville. It is an acceptable professional standard in the field of education administration and supervision for a principal to determine a staff member's effectiveness based upon competent observation, supervision and evaluation in the current assignment.

Students were asked by Ms. Nepaial to write a letter to Mr. Brewer about Ms. Black on May 8, 2005. According to Mr. Brewer, he approved of Ms. Nepaial's plan to ask students to prepare a report (letter) about Ms. Black. (Brewer: 96) Mr. Brewer said that he told Ms. Nepaial not to ask the students leading questions during the investigation. (Brewer: 107) These instructions were given to Ms. Nepaial following an incident where Ms. Barja instructed her

students to write down things that they did not like in Ms. Black's class. These letters were written on January 26, 2005. However, it is important to note that a review of the student responses reveal similarities in language that raise questions about the authenticity and sincerity of student responses. The similarity of responses indicates that, in my opinion, the students were asked leading questions and even perhaps discussed the questions and possible responses ahead of time.

It is important to note that the questions asked of the students and their responses do not constitute a valid evaluation of Ms. Black's teaching ability and, as such, should have no influence on Mr. Brewer's evaluation of her. Some examples include the student's comments that Ms. Black: gives detention for simple things; she wastes the student's time by talking to "Freddy" a stuffed toy in her classroom; she forces the students to smile; people think she is psychic; she pushes students on the head; she flicks student's ears; and she is strict. The majority of student comments written to Ms. Barja repeat similar statements.

The "letter" or report to Ms. Barja from many of the students contains the heading "Things I hate about Ms. Black", "The truth about Ms. Black", "Things I don't like about Ms. Black", and "How I feel about Ms. Black." A reasonable administrator would not assign any credibility to the responses from the students presented in this format since Ms. Barja had a motive for proving Ms. Black incompetent and not well liked by the students because of their grievances, and the design of the questions was invalid in order to show correlation to good teaching, and the format was not validated.

It is important to note that the School, through its employees, failed to utilize a system of supervision and evaluation of Ms. Black that meets the standard of professional practice in the field of education administration and supervision. Junior high school students are not cognitively able to write a report or an evaluation of their teacher since they are not privy to the overall goal of

teaching that is to set the stage and coach students toward the attainment of the school's curricula. Comments that students composed about Ms. Black were written to Ms. Barja, a teacher whom Ms. Black had filed a grievance against. As Mr. Kenty indicated in the conclusion of his investigative report regarding Ms. Black's grievance against Ms. Barja, "The whole situation is really about personality differences…"

Ms. Inos believed that the primary problem at Hopwood was miscommunication and that the teachers and staff were not following protocol. The problem was that the teachers did not like the direction the administration was taking the school in. (Inos: 79-80) When her statement is joined with the conclusion of Mr. Kenty it is important to note that there was an observation of general discontent at Hopwood among its staff that was observed at the highest levels of the system. There is no indication in the record that there was any attention focused upon the remediation of this discontent.

During September or October of 2004, a letter was circulating amongst the staff which enumerated complaints against Ms. Nepaial as an administrator. Ms. Black did not add to the letter, collect complaints for the letter, or even see the letter until it was given to her by Ms. Dukents to review before it was submitted. It was submitted to the commissioner or the Board of Education. (Black: 72) The letter was written because Mr. Brewer was unresponsive to complaints about Ms. Nepaial and had done nothing to change her behavior as an administrator. (Black: 73) Mr. Brewer recognized that Ms. Black was not a signatory to the petition against Ms. Nepaial. (Brewer: 178) However, because of rumors that were going around campus, Mr. Brewer believed that Ms. Black was involved in the drafting of this petition. Mr. Brewer said that, despite having not signed it, Ms. Black attended the each of the meetings that were held to address the petition. (Brewer: 187) Ms. Inos indicated that if enough teachers had signed the letter she would have taken action (Inos: 41) Ms. Inos stated that she received the letter in the fall but was not able to hold a meeting until the spring. (Inos: 55) It is

important to note that Ms. Inos did not consider the letter to be serious based on its contents since she did not talk with Mr. Brewer about it for many months after having received it. (Inos: 47)   Ms. Inos indicated that she did not have any concern about Mr. Brewer's administration of the school following the letter. (Inos: 62)  She assumed the letter regarding Ms. Nepaial was just "moaning and groaning" because "Beth was doing what she needs to do." (Inos: 84-85)

**Review of the Personnel File of Jimmie W. Brewer.**

Information regarding Mr. Brewer was obtained by reviewing his personnel record that was provided by the PSS.

Mr. Brewer graduated with a bachelor's in sociology from California State University and a master's in criminal justice from California Lutheran University. His work experience through 1997 included having been a security officer, a case manager at a corrections facility, a store manager, field representative for the board of corrections, juvenile hall superintendent, senior group supervisor at a corrections facility, youth counselor, and supervisor in a corrections services agency.

On January 7, 2006 Mr. Brewer took the PRAXIS series examination for Educational Leadership, Administration and Supervision.  This is an examination that is often used, along with other criteria, by states and commonwealth's to grant an individual an administration certification.

On January 8, 1998 Mr. Brewer was recommended by James Denight, Principal, Marianas High School, for the position of PSS-DYS Liaison Educational Officer. (Public School System – Department of Youth Services Education Liaison)   Mr. Brewer's employment by the PSS was effective on April 6, 1998.

In an August 31, 2001 memorandum to the Commissioner of Education Mr. Brewer was recommended for a contract extension by David Bobja, Principal. The memorandum indicated that:

> Mr. Brewer teaches all subjects in our Learning Opportunity Center (LOC). The LOC serves as our school's alternative learning center to assist students to modify their misbehavior to be more productive students in their regular classroom setting. My observations of his teaching techniques reveal that he reaches the students and helps them to learn. He has excellent rapport with his students, colleagues and parents. He is a valuable asset to our school.

At the end of the 2002-2003 school year Mr. Brewer applied for the position of Vice Principal at Hopwood Junior High School. A rating sheet for interviewers was completed for Mr. Brewer at the time he was interviewed for the position. An area that was rated less than highest was "How do you rank the applicant's ability to work with others?" The other three ratings, including overall demeanor and enthusiasm, communication skills, and questions to the committee were rated higher. It is important to note that those conducting Mr. Brewer's interview for his first school administration position failed to rate his ability to work with others as high as other categories.

Mr. Brewer's job description indicated that the duties of a Vice-Principal included, but were not limited to:

- Assists the Principal in the supervision and evaluation of the classroom teachers;
- Provides direction to staff in establishing instructional goals and objectives;
- Provides direction to staff in implementing instructional goals and objectives;
- Interacts with staff members to assist in their development; and
- Assists in the evaluation process of staff members.

When Mr. Brewer was interviewed for the position of Vice Principal by Dave Barji he answered numerous set questions and the responses were recorded on a form. One question was "What do you consider are your

strengths? Weaknesses?  The note on the interview form states "...weakness is my Type A personality – Helps me focus & produce but limits some consideration of subjective information from others."  It is important to note that Mr. Brewer, during his interview, indicated that he is limited in his ability to consider subjective information from others.  An important aspect of school administration is the ability of the administrator to consider information from others, apply that information to clearly established criteria and apply his or her training as an education administrator to make independent decisions.

Madison University awarded course credits to Mr. Brewer toward a Doctorate Degree Program in Education Administration as per a memorandum dated March 10, 2004 and on April 1, 2004 Mr. Brewer was promoted to the position of Hopwood Junior High School Acting Principal.

On May 5, 2005 Mr. Brewer applied for the position of School Principal. The job description for School Principal indicates that the individual is to work toward, among other things, achieving academic excellence. According to the description "Achieving academic excellence requires that the School Principal work collaboratively to lead and nurture all members of the school staff and to communicate effectively with parents, members of the community, and colleagues. Inherent in the position are the responsibilities for ... personnel leadership and performance assessment..."

Mr. Brewer was hired as Principal of Hopwood on July 26, 2005 and had completed a course in School Law and a course in Clinical Supervision from the University of Guam.  It is important to note that it was after the evaluation and decision, on April 25, 2005 to not renew Ms. Black's contract, that Mr. Brewer took his first courses in school administration.

## CONCLUSION

The School, through its employees, and Mr. Brewer in particular, failed to apply appropriate professional standards regarding the observation, supervision, and evaluation of Ms. Black.  Based upon my review of the record and by apply my background and experience, the complaints and concerns regarding Ms. Black during the time that she was employed at Hopwood did not constitute sufficient substantive information to the extent that it would give rise to the actions that were taken by the School, through its administrators, to fail to supervise her and further to not renew her contract.  This is especially relevant in light of the fact that Ms. Black was not provided the opportunity to correct any perceived or observed deficiencies through appropriate supervision.  After all, Ms. Nepaial rated Ms. Black well above satisfactory in most areas associated with the delivery of the curriculum and improvement of student achievement on April 14, 2005 and then her contract was not renewed by Mr. Brewer on April 25, 2005 without sufficient opportunity for the correction of any deficiencies.

It is important to note that, based upon my review of the policies and procedures of the PSS, Mr. Brewer's actions regarding the observation, supervision, and evaluation of Ms. Black, the District, through its employees, and Mr. Brewer individually, breached the professional standard of practice in the field of education and education administration and supervision.  It was this breach that created a situation within which the School failed to appropriately supervise Ms. Black by providing feedback regarding her teaching and providing assistance in perceived areas that needed improvement in a timely manner.

In addition, Ms. Black was treated in a way differently than other employees in the School and was discriminated against.  The lack of process, both of the School and within the standard of professional practice in the field of education administration and supervision makes me highly suspicious and raises the question of a pretext to cover some other motivation for her non-renewal.

**References:**

Wiles, Jon and Bondi, Joseph, Supervision: A Guide to Practice, 2000, Prentice-Hall, Inc. Upper Saddle River, NJ.

Will, Jerry D., "Positive Legal Employee Discipline," National Association of Secondary School Principals 85th Annual Convention and Exposition, Phoenix, Arizona, March 2001.

## ATTORNEY INFORMATION

Michael Dotts, Esq.
O'Connor, Berman, Dotts & Banes
Nauru Building, 2nd Floor
PO Box 501969
Saipan, MP  96950-1969
670.234.5684

## NOTICE

As a consulting expert on this case, I reserve the right to modify or supplement this preliminary report, and the opinions herein contained, as additional information is made available or as additional tasks are assigned. Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

EDWARD F. DRAGAN, ED.D, MEL, CMC

36

**References:**

Wiles, Jon and Bondi, Joseph, Supervision: A Guide to Practice, 2000, Prentice-Hall, Inc. Upper Saddle River, NJ.

Will, Jerry D., "Positive Legal Employee Discipline," National Association of Secondary School Principals 85th Annual Convention and Exposition, Phoenix, Arizona, March 2001.

## ATTORNEY INFORMATION

Michael Dotts, Esq.
O'Connor, Berman, Dotts & Banes
Nauru Building, 2nd Floor
PO Box 501969
Saipan, MP  96950-1969
670.234.5684

## NOTICE

As a consulting expert on this case, I reserve the right to modify or supplement this preliminary report, and the opinions herein contained, as additional information is made available or as additional tasks are assigned. Such tasks may include, but are not limited to, review of additional records and/or transcripts of depositions, interviews, and research.

EDWARD F. DRAGAN, ED.D., MEL, CMC

*Appendix*

1.    Résumé of Edward F. Dragan