MATTHEW T. GREGORY #F0205
Attorney General
GREGORY BAKA #F0199
Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
Hon. Juan A. Sablan Memorial Bldg., 2nd Fl.
Caller Box 10007, Capital Hill
Saipan, MP  96950-8907
Telephone:     (670) 664-2341
Fax:           (670) 664-2349
E-mail:        gbaka79@yahoo.com

Attorneys for Defendant Jim Brewer

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN MARIANA ISLANDS

|  |  |
|---|---|
| LISA S. BLACK,<br>　　　　　　　Plaintiff,<br>　vs.<br>JIM BREWER, individually and in his official capacity as Acting Principal of HJHS Junior High School, CNMI Public School System and JOHN AND/OR JANE DOE,<br>　　　　　　　Defendants. | Civil Case No. 05-0038<br><br>**DEFENDANT'S REPLY TO PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　Thur., 14 December 2006<br>Time:　9:00 a.m.<br>Judge:　Hon. Alex R. Munson |

### INTRODUCTION

In Opposition to Defendants' Motion for Summary Judgment, plaintiff alleges "there exist [sic] such an abundance of questions of material fact that to grant summary judgment would be clearly erroneous." (Page 2, lines 4 through 6.)

Plaintiff is mistaken. Defendant put forth no facts other than those offered by plaintiff. It is *plaintiff's facts* that fail as a matter of law. Moreover, while nearly five pages of plaintiff's brief is devoted to arguing that the "*Letter*" is protected speech, plaintiff fails to articulate how

*plaintiff* engaged in protected speech.  Quite simply, plaintiff's claims fail, independent of whether the Letter was protected speech, because *plaintiff did not engage in protected speech*.

As a preliminary matter, because plaintiff alleges defendants "selectively omit certain facts from their briefs" (Complaint, Page 1, lines 23 - 24), the following is from plaintiff's Deposition transcript, Page 95, line 2 through Page 100, line 1.

"Q: And why did you ---- why did she [Ms. Beth Nepaial] target you? Why do you think she targeted you?

"A: I believe there were a few factors. One of which was I believe that she thought I wanted her job. I don't know if she felt threatened by me or not, but I felt that she did . …

…

"Q: Okay. Describe ---- I guess, describe the atmosphere at Hopwood surrounding this whole petition. Was there a group for and a group against Beth Nepaial?

"A: For the letter of concern?

"Q: Uhmn.

"A: **I stayed out of most of it initially**. **And so I didn't know who signed it, who didn't sign it.** I only knew of specific people that had come to me and **express** [sic] **their concern** over her abilities. (emphasis added)

…

"Q: Okay. I believe when we left, I'd asked you about the atmosphere of Hopwood whether it was kind of pro-Beth or anti-Beth, and you said initially you didn't know who was involved. You didn't know who's involved with the petition. Did you eventually become involved with those people who were part of the letter of concern?

"A: I became involved with the group of teachers that were both involved with the letter **and those who were not involved with the letter** that had concerns with Beth and her performance at the school because I was one of those that was concerned as well. (emphasis added)

…

"Q:   And what were those concerns without repeating what you've discussed in the past?

"A:   I don't know.

"Q:   You don't know what the concerns were? You guys didn't talk as a group about what your concerns were regarding Beth's performance?

"A:   No. We were asked to leave the meeting.

"Q:   Okay. Not at that meeting but at any point, did you all have discussions about or concerns about Beth Nepaial?

"A:   With those three individuals, no.

"Q:   Okay. With anyone at Hopwood other than Ms. Sikyang?

"A:   I mentioned before **several people that had expressed concerns**, and I had mentioned previously about teachers the previous year when I had first gotten there **that expressed concerns**, and concerns were expressed at staff meetings as well. (emphasis added)

"Q:   Okay. And what were those concerns?

"A:   As I've mentioned concerns about textbooks, the textbook inventory, holding people accountable, the lack of communication, and the school treating people professionally.

"Q:   Anything else?

"A:   I don't remember.

"Q:   **Did you ever go to other staff members and solicit comments or complaints regarding either Mr. Brewer or Ms. Nepaial?**

"A:   **No.**

"Q:   **You never said to a fellow employee you don't like what Beth Nepail is doing, let me know and I can submit the complaint for you?**

"A:   **No.**

"Q: **You never said to a fellow staff member, let me know if you have a problem with Mr. Brewer, I can submit the complaint for you?**

"A: **No.**

"Q: **You can do it anonymously?**

"A: **No.**

…

"Q: Yeah. **Did you ever have discussions with other teachers regarding your complaints about Mr. Brewer?**

"A: **I don't remember.**

…

"Q: And what were your concerns regarding Mr. Brewer?

"A: My personal concerns?

"Q: Yes. What were your personal concerns?

"A: **I didn't voice those personal concerns at staff meetings**." (emphasis added)

## II.   STANDARD OF REVIEW

Defendants have no quarrel with the standard of review set forth in plaintiff's brief and so, for brevity, will not repeat it.

## III.   ARGUMENT

1. <u>Plaintiff's First Amendment Claims Fail As A Matter Of Law Because Plaintiff Failed To Establish She Engaged In Protected Activity</u>.

As stated by the Ninth Circuit in *Wasson v. Sonoma County Junior College*, 203 F3d 659 at 662 (9th Cir. 2000), "*a plaintiff must demonstrate that she has engaged in constitutionally protected expression to establish a First Amendment claim.*" (emphasis added).  Plaintiff has failed to meet this threshold.

The facts, as alleged by *plaintiff,* are that plaintiff *did not write* the letter and *did not sign* the letter. (Declaration of Lisa Black, Page 2, lines 16 - 17). Plaintiff alleges it is *"erroneous"* to believe plaintiff "was responsible for *drafting, circulating and/or encouraging others to sign*" the letter. (Complaint, Page 4, lines 1 - 2.)  Plaintiff further alleges she initially "*stayed out of*" the discussions regarding the letter, and *did not know* "who signed it, who didn't sign it." (Deposition transcript, Page 96, lines 3 - 6.)  Plaintiff *did not* "*solicit comments or complaints* regarding either Mr. Brewer or Ms. Nepail," (Deposition transcript, Page 98, lines 17 - 20) and "*never said* to a fellow employee" that plaintiff would "*submit the complaint*" on behalf of the employee (Deposition transcript, Page 98, lines 21 – 24 and Page 99, lines 1 - 6). Plaintiff *does "not remember"* having any discussions with other teachers regarding complaints about Mr. Brewer (Deposition transcript, Page 99, lines 11 - 13) and "*didn't voice personal concerns*" about Mr. Brewer at staff meetings (Deposition transcript, Page 99, lines 21 - 24).

Defendants do not argue the facts. Rather, the facts are replete with *denials* about all the activities in which defendant did *not* engage, but contain no facts demonstrating plaintiff's *actual exercise* of protected speech. At best, plaintiff alleges she "shared some of the concerns" of members who wrote or signed the letter (Declaration, Page 1, lines 23 - 24), but does not articulate how the "concerns" were exercised in any way that warrants constitutional protection.

Moreover, while plaintiff claims to have "involved herself with the persons responsible for the Letter," (Response, Page 4, lines 19 - 20), plaintiff also claims to have been "involved" with "those who were not involved with the letter." (Deposition transcript, Page 96, line 24, and Page 97, lines 1 - 2).  Thus, while offering no evidence that anyone who actually participated in the Letter received a negative employment action, plaintiff asks to present to the jury a claim that she, uniquely, was punished, in violation of her First Amendment rights, not for actually

exercising any articulated right, but simply because she "shared concerns" or was "involved" with those who exercised their rights. Regardless of plaintiff's "involvement" with either group, plaintiff has not cited any principle of law allowing recovery for a person who is merely "involved" with a group exercising (or not exercising) First Amendment rights.

    2.    <u>Lack of Negative Action Does Not Indicate The Letter Was Not Disruptive</u>.

Plaintiff states that because there was no "non-renewal, termination and/or censure" (Complaint, Page 11, line 21) of any person who actually participated in the Letter, defendants cannot claim that the Letter was unduly disruptive. This argument is nonsensical. It is quite possible for an employee to engage in activity that is not constitutionally protected and, at the same time, for an employer *not* to impose a negative employment consequence therefore. That is, defendants' belief that the Letter was not protected did not *compel* defendants to punish its drafters or participants.

    3.    <u>Plaintiff's "Liability Expert" Cannot Establish A Triable Issue Of Fact.</u>

Plaintiff alleges that a reasonable trier of fact, after listening to plaintiff's "liability expert" could find that plaintiff's "protected activity was, in fact, a substantial reason for her non-renewal." (Response, Page 11, lines 4 - 6) The problem with this assertion is that plaintiff has not demonstrated she actually engaged in "protected activity," and the Ninth Circuit requires "actual engagement" for a First Amendment claim. Therefore, plaintiff's "liability expert," a non-lawyer from New Jersey, cannot establish a triable issue of "pretext" or "wrongful discharge" in violation of First Amendment rights where the Ninth Circuit has expressly ruled that no First Amendment retaliation claim can exist.

4. <u>CNMI Law Does Not Equate Non-Renewal With Termination</u>.

Defendants offered as instructive the case of *Motevalli v. Los Angeles Unified School District,* 122 Cal. App. 4th 97 (2004), because *Motevalli* had facts and questions of law very similar to this case. In *Motevalli*, the court held that no cause of action exists for tortious non-renewal of an employment contract in violation of public policy. The Court noted:

> "… '**We are unaware of any case, and [plaintiff] presents none, in which an employer was held liable in tort for refusing to renew an employment contract that had expired by its own terms.**' (*Motevalli*, *supra*, at 572, emphasis added)

In a seeming attempt to argue that the CNMI is the single exception, plaintiff cites a "*default judgment*" in *Equal Employment Opportunity Commission v. Sako Corp.*, Civil Action # 04-0025. Plaintiff posits: "There, this Court considered, and recognized that the non-renewal of a contract worker in Saipan is tantamount to termination." (Complaint, Page 12, lines 24 - 26).

Plaintiff's argument is flawed. "A default judgment is entered without regard to the merits of the plaintiff's claim." *Am. Jur. 2d*, *Judgments*, § 265. Rather, a default judgment is a procedural determination in favor of one party because the other party failed to respond.

5. <u>CNMI's "Unique Environment" Does Not Demand That Non-Renewal Equal Termination.</u>

Plaintiff claims that because "the majority of persons employed with the CNMI are on fixed-term contracts that are non-renewable at the discretion of their employer, "for this tort to have any meaning, non-renewal must equal termination." (Response, Page 13, line 11.) Assuming "this tort" refers to the tort of wrongful termination, plaintiff is categorically wrong.

Employment relationships are either "at will" or under contract. In "at will" employment, either party may terminate the relationship at any time, without cause or notice. In a contract

relationship, by contrast, the parties bargain for certain rights or conditions that control the relationship. So, in the CNMI, for example, most employment contracts are for a specified term, and provide transportation costs to and from the CNMI for employees who complete the specified term. Through the contracts, the CNMI is able to entice employees who might not accept employment *but for* the transportation clause and, in return, the CNMI receives a time limitation on its employer obligations.

Plaintiff does not argue that the contract was unlawful, unconscionable, or otherwise unenforceable. Rather, plaintiff urges the contract be ignored because, plaintiff claims, to uphold the contract would destroy the tort of wrongful termination. Plaintiff is wrong.

It will not destroy the tort of wrongful termination if the distinction between at-will and contract employment is recognized. It will not destroy the tort of wrongful termination if parties are allowed the contractual rights for which they bargained (that is, to allow the contract to expire according to its terms). Rather, this court would be in line with every other court that has considered, and rejected, a cause of action for tortious non-renewal of an employment contract.

6. <u>Plaintiff Had No Property Interest In Continued Employment</u>.

Plaintiff concedes it is "facially correct" that plaintiff's contract and PSS regulations demonstrate plaintiff had no interest in continued employment past the terms of the contract. (Response, Page 13, lines 23 - 25 and Page 14, line 1). Nonetheless, plaintiff urges this court to ignore the "correct" interpretation and present to the jury a question of whether plaintiff's expectation of renewal was "reasonable" based on statistical probabilities.

Plaintiff's request is not only contrary to the contract and PSS regulations, as plaintiff concedes, it is also contrary to the ruling of the Ninth Circuit in *Dyack v. Commonwealth of the Northern Mariana Islands,* 317 F.3d 1030, 1034 (9th Cir. 2003), holding that among CNMI

government employees, "only civil service employees have a property right to continued employment." *Dyack*, *supra*, at 1037. Plaintiff was not a civil service employee.

7. <u>Plaintiff's Causes Of Action For Invasion Of Privacy And Liberty Must Fail Because Plaintiff's Facts Do Not Demonstrate Wrongful Conduct By Defendants.</u>

In support of plaintiff's claim that defendants tried to "blacklist" plaintiff, plaintiff submits the Declaration of Mr. Roland Brown. Unfortunately for plaintiff, the Declaration does not contain any "facts" that implicate wrongdoing on the part of defendants. Rather, the Declaration states that Mr. Brown "was informed by *persons* other than Ms. Black regarding certain issues that Ms. Black had with the administration" and was also "informed that Ms. Black had a warrant issued" for her arrest. (Declaration, Page 2, lines 2 - 3 and 11 – 12, emphasis added.)

The Declaration does not state that the "persons" who "informed" Mr. Brown were defendants, or even persons acting on behalf of defendants. While the Declaration does state Mr. Brown's "understanding" that the information had been "disseminated" by Hopwood staff and administration (Declaration, Page 2, lines 8 - 9), the Declaration does not state *how* or *why* Mr. Brown came to that understanding. It is reasonable to assume that if Mr. Brown had any information implicating defendants, or persons acting on their behalf, Mr. Brown would have so declared. He did not.

8. <u>Defendant's Conduct Was Not "Outrageous" As A Matter Of Law</u>.

Plaintiff asks that the claim for intentional infliction of emotional distress continue because plaintiff's distress was "severe" even though it was "typical." Even if "typical" stress can be "severe" enough to be actionable, plaintiff fails to establish that defendant's conduct was "extreme and outrageous." Non-renewal was permitted by both the contract and the statutes. Plaintiff offers no "fact" implicating defendants in "blacklisting." Therefore, as a matter of law,

defendant's conduct is not "beyond all bounds tolerated in a civilized community."

Similarly, plaintiff's claim for negligent infliction of emotional distress must fail. "There is no such thing as the independent tort of negligent infliction of emotional distress." *Macy's California, Inc. v. Superior Court*, 41 Cal. App. 4th 744, 747 (Cal. Ct. App. 1995). Even if plaintiff was able to establish that her distress was "serious," she cannot, as a matter of law, establish that defendant's conduct was "wrongful." As stated by the court in *Motevalli v. Los Angeles Unified School District*, 18 Cal. Rptr. 3d 562, *supra*, no cause of action exists for tortious nonrenewal of an employment contract.

9. <u>Plaintiff's Claim For Breach Of Contract Is Barred By The Statute Of Limitations.</u>

Plaintiff concedes that "some of Plaintiff's contracts" are barred by the statute of limitations, but argues against summary judgment because "more recent contracts, a reasonable finder of fact could hold, contain 'off island hire' provisions that fall within the statute of limitations." (Response, Page 24, lines 8 through 10). This argument is wrong. It is not for "a reasonable finder of fact" to determine whether a claim is barred by the statute of limitations. Rather, it is a question of law appropriate for summary judgment.

### IV. CONCLUSION

For the reasons contained herein, and in Defendant's Memorandum in Support of Summary Judgment, defendant respectfully requests that the Court grants summary judgment for defendants on all claims contained in Plaintiff's complaint.

DATED this 7th day of December, 2006.

                                                       /s/
                                         GREGORY BAKA #F0199
                                         Deputy Attorney General